UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

(Charlottesville Division)

| | |
|---|---|
| JASON KESSLER, | ) Case No. 3:17-cv-00056 |
| | ) |
| Plaintiff, | ) COMPLAINT FOR |
| | ) DECLARATORY AND |
| v. | ) INJUNCTIVE RELIEF |
| | ) AND DAMAGES |
| CITY OF CHARLOTTESVILLE | ) |
| | ) |
| and | ) |
| | ) |
| MAURICE JONES, | ) |
| Charlottesville City Manager | ) |
| In his official and individual capacities, | ) |
| | ) |
| Defendants. | ) |

## VERIFIED COMPLAINT

### PRELIMINARY STATEMENT

1. The First Amendment guarantees political speech, including protest, the highest level of protection—and the right to speak out is most robust in traditional public fora, including public parks and streets. Since this country's founding, people have taken to the parks, streets, and sidewalks to make their voices heard on matters of public concern. This case is about viewpoint discrimination by Defendants against Plaintiff. Plaintiff's views are highly controversial and have evoked strong protests and demands heard by City Council that his permit be revoked.

2. Plaintiff seeks to exercise his protected right to protest in a public park by organizing a rally in Emancipation Park ("the Park") on August 12, 2017.

1

3. Plaintiff wishes to communicate a message that relates directly to the Park—specifically, his opposition to the City's decisions to rename the Park, which was previously known as "Lee Park," and its plans to remove a statue of Robert E. Lee from the Park.

4. On June 13, 2017, Defendants granted Plaintiff a permit to hold his rally in the Park on August 12, 2017. In the following weeks, Defendants granted organizations that oppose Plaintiff's message permits to counter-protest in other public parks just blocks away from the Park.

5. On August 7, 2017, less than a week before the long-planned and permitted event in the Park, however, Defendants notified Plaintiff in a press conference and by letter (Exhibit B) that they were revoking Plaintiff's permit and "modif[ying]" their permission to allow Plaintiff to hold his rally in McIntire Park only. McIntire Park is not connected to Plaintiff's message, and is located more than a mile from the Park.

6. In the August 7 letter, Defendants explained their decision by saying that "it [came] to the City's attention that many thousands of individuals are likely to attend the demonstration." Defendants further asserted that the City would be "unable to accommodate safely even a peaceful crowd of this size" in the Park.

7. Defendants have permitted events with audiences numbering several thousand in the Park in the past, and the events have proceeded without incident. The Charlottesville Police Department has never before suggested that it would be unable to handle crowds downtown during festivals held in Emancipation Park that have drawn many thousands of people.

8. While the government may impose narrowly-drawn time, place, and manner restrictions on the exercise of the rights to speak, petition or assemble, including permit requirements, the First Amendment prohibits the government from blocking a protest based on its content or viewpoint, or based on how the government anticipates others will respond to the

2

protest. The revocation of Plaintiff's permit was based on his viewpoint and was not necessary to achieve any compelling governmental interest.

9. Plaintiff's constitutional rights will be violated, and irreparable harm will result, if the Court does not provide immediate relief enjoining Defendants from preventing or impeding Plaintiff's constitutional rights to free speech, petition, and assembly.

## PARTIES

10. Plaintiff Jason Kessler is an adult natural person who resides in the Commonwealth of Virginia.

11. Defendant City of Charlottesville ("the City") is a political sub-division of the Commonwealth of Virginia.

12. Defendant Maurice Jones is an adult natural person who is the City Manager for the City of Charlottesville in the Commonwealth of Virginia. At all times relevant, Defendant Jones acted and continues to act under color of state law. Defendant Jones is sued in his official and individual capacities.

## JURISDICTION AND VENUE

13. This case arises under the United States Constitution and the laws of the United States. The case presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331; this Court also has jurisdiction under 28 U.S.C. § 1343(3) to redress the deprivation, under color of state law, of any right, privilege, or immunity secured by the Constitution of the United States.

14. The case seeks remedies under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and Fed. R. Civ. P. 65. This Court may issue a temporary restraining order and preliminary injunction pursuant to Fed. R. Civ. P. 65(b).

15. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

### From Lee Park to Emancipation Park

16. The City of Charlottesville owns the park bounded by Jefferson Street, First Street N.E., Market Street and Second Street N.E ("the Park").

17. Historically, the Park was known as "Lee Park." On June 5, 2017, the City renamed the Park "Emancipation Park."

18. Emancipation Park houses a statue of Robert E. Lee. The City plans to sell the statue and have it removed from the Park.

19. The City's decision to rename the Park and sell the statue have resulted in a number of protests in the Park, one involving a gubernatorial candidate and another an unpermitted nighttime torchlit march on May 13, 2017 in which Plaintiff and others who plan to attend the August 12th rally participated.

20. Plaintiff opposes both the name change and the planned removal of the statue. To communicate his political message, Plaintiff sought to organize a "Unite the Right" rally in the Park to express opposition to both decisions by the City.

21. Plaintiff's choice of location is critical to the message of the rally, which specifically opposes two City policy choices about the Park. Holding the protest elsewhere would dilute and alter Plaintiff's message.

### Defendants Granted Plaintiff's Permit

4

22. Defendants require persons wishing to exercise their First Amendment rights on its public land to obtain a permit from the City's Events Coordinator. *See* City of Charlottesville Standard Operating Procedure ("SOP") § 3.2.

23. Wishing to exercise his right, Plaintiff duly submitted an application to the City of Charlottesville on May 30, 2017. Plaintiff applied for a permit to hold a "[f]ree speech rally in support of the Lee monument" in the Park on Saturday, August 12, 2017. (Exhibit A).

24. In the permit application, Plaintiff estimated that approximately four hundred people would demonstrate at the planned rally. (Exhibit A).

25. Pursuant to City of Charlottesville SOP § 3.4.6(b), the City granted Plaintiff's permit application on June 13, 2017.

<u>Defendants Revoked Plaintiff's Permit</u>

26. On August 7, 2017, more than a month after granting the permit and less than a week before the planned rally—Defendant Maurice Jones sent Plaintiff a letter on behalf of the City. (Exhibit B).

27. In the Letter, Defendants "denied" or "revoke[d]" the permit for the demonstration in Emancipation Park. (Exhibit B)

28. Defendants also purported to "modif[y]" Plaintiff's permit "to specify that the demonstration take place at McIntire Park," rather than the Park. (Exhibit B)

29. McIntire Park is not connected to Plaintiff's message, which centers on the City's policy decisions regarding Emancipation Park and the Lee statue in the Park.

30. In addition, McIntire Park is located more than a mile away from Emancipation Park.

31. Relocating to McIntire Park would substantially undermine Plaintiff's ability to communicate his message about the renaming of Emancipation Park and the decision to remove the Lee statue from the Park.

32. Defendants say they revoked the permit for Emancipation Park because "it [came] to the City's attention that many thousands of individuals are likely to attend the demonstration." Defendants did not identify the source of this estimate. Based on the unsupported crowd estimate, Defendants asserted that the City would be "unable to accommodate safely even a peaceful crowd of this size" in Emancipation Park, and that "the presence of such a large demonstration in Emancipation Park would . . . lead[ ] to massive traffic congestion[.]" (Exhibit B).

33. Defendants have acknowledged that "[t]he use of McIntire Park will still require the deployment of considerable law enforcement resources[.]

34. Moreover, the City Police Department is now preparing for the possibility that people will gather at both parks during the rally. The City has announced that it plans to deploy resources in the downtown area at and around Emancipation Park, negating any possible safety or traffic congestion benefit from moving the rally to McIntire Park.

35. In the August 7, 2017 letter, Defendants said that holding the rally in Emancipation Park would "lead[ ] to massive traffic congestion" due to road closures. Moving the rally to McIntire Park has not alleviated this concern. Instead, the City's preliminary plans for managing the August 12 events include the possibility of road closures during the rally. (Exhibit B)

36. The City granted permits for demonstrations opposing Plaintiff's views to occur on August 12, 2017 in Justice and McGuffey Parks located just blocks away from Emancipation Park in the same downtown area. Those demonstrations are said to be organized to protest "the messages of racial intolerance and hatred advocated by" the persons attending the demonstration in the Park.

6

Upon information and belief, the organizers of these other events have encouraged and expect an attendance of more than 1,000 persons.

37. Despite their allegation that the decision to revoke Plaintiff's permit was not based on the views he wishes to express, but on the numbers of possible participants, Defendants have taken no action to modify or revoke the permits issued for demonstrations by those with opposing views.

38. The City's concerns about holding the rally in the Park appear to stem, at least in part, from fears of how counter-protesters will respond to the rally. In explaining its plans to prepare for rallies at both Emancipation Park and McIntire Park, the City explained that "[w]ith large crowds of individuals with strongly held *and potentially opposing* beliefs, there is also the potential for conflict." *See City preparing for large crowds Saturday*, Daily Progress (Aug. 9, 2017), available at www.dailyprogress.com/news/city-preparing-for-large-crowds-saturday/article_94918c6c-7d57-11e7-901e-afca3a9cb91b.html (emphasis added). This builds on the City's experience during the Ku Klux Rally in downtown Charlottesville on July 8, 2017, during which the Charlottesville Police Department asserted that counter-protesters were involved in an "unlawful assembly" and used tear gas to disperse the counter-protests.

<u>Defendants' Reason for Revocation</u>

39. The Defendants claim that the decision to revoke and modify Plaintiff's permit was a "numbers" decision based on a belief that "many thousands" of people both supportive of Plaintiff and opposed to Plaintiff would attend. No information about the basis for this belief was given by Defendants although some have cited a Facebook event for the demonstration which currently indicates that 700 plus people are "going" and another 1,300 people are "interested." (Exhibit G). There is no estimate offered for the number of counter-protestors.

7

40. This Park has been for many years a traditional forum for the exercise of First Amendment rights. Numerous other groups have protested and demonstrated and held other events in the Park. Defendant has provided no information about the capacity of the Park, although the August 7, 2017 letter says that the Park is just over one acre in size. This court may take judicial notice of the facts that an acre is 4840 square yards, or 43,560 square feet and average adults (50-50 male-female) take up a cross-sectional area of about 1.5 to 2.0 square feet at chest or hip level. Taking those facts and applying basic math (dividing the number of square feet in an acre by the area taken up by average adults) an estimate of the number of people that could be accommodated standing on an acre of land would be between 29,040 and 21,780 people per acre.

41. The Charlottesville Police Department has the ability to deploy not only its own officers to provide protection of Plaintiff's exercise of his First Amendment rights but also officers from the Virginia State Police, other local law enforcement agencies, and, potentially, the Virginia National Guard. This was demonstrated during the July 8, 2017 Ku Klux Klan rally.

42. At the press conference held on August 7, 2017 at which the Defendants announced the decision to revoke Plaintiff's permit, the Charlottesville Police Chief never said that his department could not provide adequate protection for Plaintiff's proposed rally at Emancipation Park using City's active duty police force and, if necessary, additional local, state and federal forces. The Chief's statement included information about why his department felt that having the demonstration in McIntire Park would be "safer" but did not say that the Department would be "unable" to protect the safety of demonstrators, counter-demonstrators and the public in the downtown Emancipation Park location, especially if the City enacts the preliminary plans for road closures announced on August 9, 2017.

8

43. The City can rely on other local, state and federal forces to adequately manage the rally if necessary. On August 9, 2017, the City announced that its police department has been working with other police agencies, including the Virginia State Police, to prepare for the rally and that the local and state forces together intend to "have a visible presence" at the rally. While members of the National Guard have not yet been called upon, the City stated that the National Guard Forces will monitor events and will respond if needed.

44. The City's claim that it cannot safely manage a demonstration involving 400 people and possibly "thousands" is belied by the fact that the City routinely manages crowds of up to 3,500 people at the Sprint Pavilion on the Downtown Mall and previously has granted permits for rallies and events with "thousands" of attendees in Emancipation Park without incident or intervention from the City. For example, in 2013, 2014 and 2015 an estimated minimum 2,000 people attended the Cville Pride Festival in Emancipation Park each year. Upon information and belief, thousands of people attend an annual Spring block party in Emancipation Park. On May 14, 2016, it was reported that "thousands" of people gathered in Lee Park [sic] for a Festival of Cultures event. (Exhibit H).

45. People also have been allowed to demonstrate in the Park without permits in circumstances where the number of potential participants could not be forecast. On May 14, 2017 after a torch lit demonstration the previous night protesting the renaming of Emancipation Park and proposed removal of the Lee Statue, a candlelight vigil was held in the Park by counter-protestors without incident. Neither event was permitted. (Exhibit I).

46. The City has also allowed at least one event promoting a progressive point of view supported by the Mayor to take place on public grounds in a downtown area smaller than Emancipation Park without a permit. On January 31, 2017, there was a demonstration in front of

9

Charlottesville City Hall (not sponsored by the City) at which Mayor Michael Signer proclaimed Charlottesville the "Capital [sic] of the Resistance" after the inauguration of Donald Trump. The event drew as many as seven hundred attendees. No permit was obtained by the organizers in advance nor was there any response by Defendants after the fact to sanction the organizers for holding such a rally without the required City permit. Leading up to this event, a Facebook event page listed 487 people as "going" and another 951 as being "interested." (Exhibit H). Mayor Signor remarked after the event that he was "stunned by the huge, spontaneous turnout on such short notice which I think is evidence of how strongly folks feel about standing up for American values."

47. The City has expressed a preference for the counter-protesters. On August 9, 2017, a spokeswoman for the City encouraged individuals to "consider attending [events on counter programming to the rally]." The City has never encouraged individuals to consider attending Plaintiff's rally.

48. Members of the City Council who have the authority to hire and fire Defendant Jones have made clear their opposition to Plaintiff's political viewpoint. On June 21, 2017, Mayor Michael Signer described the planned August 12th rally's content and speakers as "racist and bigoted." (Exhibit C). Previously, after a candlelight vigil held as a counter protest to a "torch" lit demonstration against the Park renaming decision the night before, Mayor Signer issued a public statement saying that "intolerance is not welcome here" and the next day tweeted a picture of the May 14, 2017 vigil with the caption, "Candlelight vigil against hate in Cville. These are the kind of "torches" I like to see." (Exhibit F and Exhibit E). On August 2, 2017, Vice Mayor Wes Bellamy responded to a tweet from the Twitter handle "Solidarity Cville," which described the "Unite the Right" rally as "fascism" and called for confronting the event, with "this is dope! #Resist." (Exhibit J)

10

49. At the Charlottesville City Council meeting on Monday, July 17, 2017, 13 of the 15 people who spoke during the public comment period either criticized the actions of the Charlottesville Police Department and the Virginia State Police during and after the Ku Klux Klan rally on July 8 or advocated that the permit granted to Plaintiff for the August 12th demonstration be revoked or reissued for McIntire Park because of their opposition to the Plaintiff's message or both. When the City Manager began to respond to the public comments about the police actions at the July 8th event taken against counter-demonstrators during and after the Ku Klux Klan representatives were demonstrating, the crowd became disruptive, yelling "liar," and the Mayor suspended the meeting rather than have police personnel remove those who were disrupting the City Manager's comments.

50. On July 27, 2017, 43 downtown businesses wrote a letter to Council demanding that the City treat the planned August 12th demonstration like a public event and impose additional requirements on the organizer and that it consider moving the event because of the risk to public safety and their businesses. One business owner who signed the letter said that "the organizer and other would-be attendees" at the demonstration had "crossed the line from free speech to basically a call to imminent lawless action."

51. In an interview with CBS19News on July 12th Plaintiff said that he "absolutely intends to have a peaceful rally." Plaintiff added that he expected 400 people from around the country to attend and promised that his group would "avoid violence." In the same news story, critics of Plaintiff said that they would encourage their members to show up "in large numbers" and argued that the police should not show up because they "put people in danger."

52. Despite representations that the decision to revoke the Plaintiff's permit was made by Defendant City Manager, there was a closed three-hour meeting of City Council on August 2,

11

2017 at which Defendant City Manager, the City Attorney and other staff including some representatives of law enforcement were present. Council issued a statement that evening about the subject of the meeting: "This evening, Charlottesville City Council met in closed session to consult with legal counsel and staff regarding the best options to keep the community safe during the August 12 Unite the Right Rally while preserving the 1st amendment rights of participants."

53. The Plaintiff met with Defendant City Manager Maurice Jones, Park's Business Operations Supervisor Michelle Christian and Police Captain Wendy Lewis the morning of Monday, August 7th. At the meeting, the Defendant City Manager asked the Plaintiff to accept the City's decision to modify his permit for McIntire Park. Plaintiff asked the City Manager what the occupancy limit for Emancipation Park would be and asked if the permit could be kept in place if he agreed to keep the crowd size within that limit. The Defendant would or could not give Plaintiff an occupancy limit number. Then, Plaintiff asked Defendant whether he could maintain the permit if he agreed to have the attendance limited to 400. The Defendant City Manager did not respond and proceeded to implement his decision to revoke and modify the permit as described in the August 7 letter without providing an answer or seeking to resolve any legitimate public safety concerns Defendants might have about holding the demonstration in Emancipation Park.

54. Later on August 7th, after the press conference where the City announced that the permit for Emancipation Park was revoked, Plaintiff entered a closed door meeting with Captain Lewis, Chief of Police Al Thomas and Incident Commander Captain Victor Mitchell. Plaintiff asked if the police would still enforce previously agreed upon security arrangements for the Unite the Right demonstration in the Park whether there was a permit for that site or not. The Chief of Police indicated in the affirmative. Plaintiff asked the Chief if the police would still keep counter-demonstrators out of the park prior to the Unite the Right demonstration and he indicated in the

12

affirmative. Plaintiff also asked Chief Thomas if the police would still set up barricades around the park and allow Unite the Right to control access into the park via two entrance points on the Market Street side of the park as was previously agreed upon. He indicated in the affirmative.

55. The next day on Tuesday, August 8th Plaintiff met with Captain Lewis, Captain Mitchell and one other police official. They told Plaintiff that Chief Thomas changed his mind and that the Plaintiff's demonstration would receive none of the protections in Emancipation Park promised the day before. The police representatives also told Plaintiff that the police would only keep people out of Lee Park until 6am when it typically opens instead of allowing Unite the Right to restrict access to their demonstrators as had previously been agreed. The police said that the Park would be divided in half between demonstrators and counter-demonstrators. Plaintiff asked how the police intended to tell one from the other or to preserve distinct areas for demonstrators with opposing views. The police representatives told Plaintiff that there was no plan for them to do that, so theoretically the counter-demonstrators would not only still have permits for the two other parks in the area (McGuffey and Justice) but also be allowed to occupy all of Emancipation Park without a permit being issued.

56. Before leaving the meeting on August 8th, Plaintiff asked if Parks and Recreation would allow use of the power or water in the park and they said no. Plaintiff asked why all these changes had been made to security and the policy of Parks and Rec and if this was due to political pressure. Capt. Lewis indicated affirmatively with her facial expression and body language.

57. Thus, with his scheduled rally only two days away, Plaintiff does not have a permit enabling him to demonstrate in Emancipation Park, and counter-demonstrators have two downtown permits and the ability to occupy Emancipation Park without a permit.

13

58. Unless Defendants and their agents are enjoined, Plaintiff, other similarly-situated protesters who share his views, and other members of the public will be irreparably harmed as they will be prevented from peacefully gathering to express their views on pressing issues of public concern at a time, place and in a manner reasonable for them to do so.

## CLAIM FOR RELIEF
## FIRST AND FOURTEENTH AMENDMENT RIGHTS
## 42 U.S.C. § 1983

59. The foregoing paragraphs of this Complaint are incorporated by reference as if each is fully set forth herein.

60. Defendants' revocation of the requested permit violated—and, unless enjoined by this Court, will continue to violate—Plaintiff's rights to freedom of speech, assembly, and petition as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

61. The Defendants' revocation of Plaintiff's permit was based on his viewpoint and was not necessary to achieve any compelling government interest, in violation of the First and Fourteenth Amendments;

62. To the extent that the revocation of the permit was based on crowd size, the revocation was not narrowly tailored to a substantial government interest, and did not leave open alternative means of communication.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays that this Honorable Court:

A. Enter judgment declaring that Defendants' revocation, denial and/or modification of Plaintiff's requested permit to hold a demonstration in Emancipation Park on August 12, 2017 violates the First and Fourteenth Amendment to the United States Constitution;

B.  Enter a temporary restraining order and/or preliminary injunction enjoining Defendants to permit the demonstration to go on as planned in Emancipation Park on August 12, 2017 from 12pm to 5pm and to provide such security as may be necessary to protect the rights of the demonstrators and the public.

C.  Award Plaintiff his costs and reasonable attorneys' fees in this action;

D.  Grant Plaintiff such other and further relief, including damages for the violation of Plaintiff's constitutional rights, as the Court may deem just and proper.

Respectfully submitted,

JASON KESSLER

By Counsel

Dated: August 10, 2017

Counsel for Plaintiff


//s// Hope Amezquita
Hope R. Amezquita (VSB No. 74629)
Leslie Mehta(VSB No. 90437)
American Civil Liberties Foundation of Virginia, Inc.
701 E. Franklin St., Ste. 1412
Richmond, VA 23219
Phone: 804-644-8080
Fax: 804.649.2733
Email : lmehta@acluva.org
Email: hamezquita@acluva.org

//s// Victor M. Glasberg
Victor M. Glasberg (VSB No. 16184)
Maxwell C. Sokol (VSB No. 89589)
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
Phone: 703-684-1100
Fax: 703-684-1104
Email: vmg@robinhoodesq.com
Email: msokol@robinhoodesq.com

15

John Whitehead (VSB No. 20361)
Douglas R. McKusick (VSB No.72201)
The Rutherford Institute
923 Gardens Boulevard
P.O. Box 7482
Charlottesville, Virginia 22906
Phone: 434-978-3888
Fax: 434-978-1789
Email: johnw@rutherford.org
Email :douglasm@rutherford.org

## CERTIFICATION OF COUNSEL

Pursuant to Fed. R. Civ. P. 65, counsel certifies that he will attempt to give notice to Defendants of CM/ECF filing to the following:

S. Craig Brown, City Attorney
City Attorney's Office
P.O. Box 911
Charlottesville, VA 22902
Phone: 434-970-3101
Facsimile: 434-970-3890
Email:brownc@charlottesville.org

## VERIFICATION

I, Jason Kessler, the plaintiff herein, declare under penalty of perjury that I am personally acquainted with the matters alleged in paragraphs 3, 4, 5, 7, 10, 19, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 35, 48, 51, 53, 54, 55, 56, and 58. and that the allegations in these paragraphs are true to the best of my knowledge, information and belief.

_____
Jason Kessler