CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 11 2017

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

Charlottesville Division

JASON KESSLER, | Case No. 3:17cv56

Plaintiff,

v.

CITY OF CHARLOTTESVILLE

and

MAURICE JONES,

**Charlottesville City Manager**

In his official and individual capacities,

Defendants.

## MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

### INTRODUCTION

The First Amendment guarantees political speech, including protest, the highest level of protection—and the right to speak out is most robust in traditional public fora, including public

1

parks and streets. Since this country's founding, people have taken to the parks, streets, and sidewalks to make their voices heard on matters of public concern.

This case is about viewpoint discrimination against Plaintiff by Defendants who denied him a permit to exercise his freedom of speech in a public park in Charlottesville, Virginia because of his views. It is also about the burden government must meet when seeking to regulate the "place" of speech to deny a person access to a traditional public forum, a public park, that is closely associated with the message the person seeks to communicate. Finally, it is about when and whether the voices opposing a person's speech can be preferred by government and allowed to drive the speech with which they disagree out of a public place where its meaning is most salient.

Plaintiff seeks to exercise his protected right to protest in a public park by organizing and holding a rally in Emancipation Park ("the Park") on August 12, 2017. Plaintiff wishes to communicate a message that relates directly to the Park—specifically, his opposition to the City's decisions to rename the Park, which was previously known as "Lee Park," and its plans to remove a statue of Robert E. Lee from the Park. Defendants first granted and, then, revoked a permit to hold the rally as Plaintiff requested offering him a modified permit to hold a rally at another park a mile distant from Emancipation Park and the statue that is the focus of Plaintiff's protest.

Plaintiff's views are highly controversial and have evoked strong protests and demands that City Council revoke his permit for the planned rally on August $12^{th.}$ The City's decision to revoke and modify Plaintiff's permit was a decision made to satisfy those with opposing views, and is not legitimately related to any government interest much less narrowly tailored to meet it.

In this motion, Plaintiff seeks a Temporary Restraining Order and/or Preliminary Injunction requiring Defendants to permit the demonstration to go on as planned in Emancipation

2

Park on August 12, 2017 from 12pm to 5pm and to provide such security as may be necessary to protect the rights of the demonstrators and the public.

## FACTS

On May 30, 2017, Plaintiff applied for a permit to hold a rally in Emancipation Park on August 12, 2017. In the application, he estimated that 400 people would participate. Ver. Comp. ¶¶23 and 24

On June 13, 2017, Defendants granted Plaintiff a permit to hold his rally in Emancipation Park on August 12, 2017. Ver. Comp. ¶25 In the following weeks, Defendants granted organizations that oppose Plaintiff's message permits to counter-protest in other public parks just blocks away from Emancipation Park.

On August 7, 2017, less than a week before the long-planned and permitted event in Emancipation Park, however, Defendants notified Plaintiff by letter that they were revoking Plaintiff's permit and "modif[ying]" their permission to allow Plaintiff only to hold his rally in McIntire Park. McIntire Park is not connected to Plaintiff's message and is located more than a mile from Emancipation Park. Ver. Comp. ¶¶ 26-30

At same time, however, Defendants took no action to modify or revoke the permits issued to counter-protestors for two other parks within blocks of Emancipation Park.

The City's decision to revoke Plaintiff's permit for a demonstration at Emancipation Park was made after negative public comment received at a City Council meeting, the publication of a letter by business leaders asking that the Plaintiff's demonstration be moved to McIntire Park, and at least one closed meeting with City Council. Ver. Comp. ¶¶ 49, 50 and 52.

In revoking the permit, the City cited "safety concerns" associated with the number of people expected to attend Plaintiff's rally but cited no source for those concerns nor reason why

3

those concerns resulted in adverse action on Plaintiff's permit but not on the permits of counter-demonstrators. Ver. Comp. Exhibit B Moreover, when Plaintiff asked what number of attendees in the Park would be acceptable or whether limiting participation to the original 400 people estimated to attend in the permit application would allow the permit to remain in place, Defendants did not respond and did not seek to work with Plaintiff to resolve any legitimate safety concerns the City might have. Ver. Comp. ¶53

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008).

In this case, these factors weigh heavily in the plaintiff's favor.

### I.    The Plaintiff is Likely to Succeed on the Merits

Freedom of speech "is subject to reasonable time, place, or manner restrictions....[R]estrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984). The City of Charlottesville's decision to revoke Plaintiff's permit for a demonstration at Emancipation Park was not made "without reference to the content" of his speech, was not narrowly tailored to serve a significant governmental interest and did not leave Plaintiff an ample alternative means to convey his message.

4

In addition, revocation of the Plaintiff's permit constitutes a prior restraint on his speech and the speech of his supporters, and Plaintiff has a right to due process including notice of the reasons for the revocation and an opportunity to respond to the reasons given by the City for revoking the permit.

**A. The City's Decision to Revoke Plaintiff's Permit Was Based on the Content of His Speech**

The principal inquiry in determining content-neutrality in speech cases generally, and in time, place, or manner cases is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. *Community for Creative Non-Violence*, supra, at 468 U. S. 295. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages, but not others. See *Renton v. Playtime Theatres, Inc.*, 475 U. S. 41, 475 U. S. 47-48 (1986).

Government regulation of expressive activity is content-neutral so long as it is "justified without reference to the content of the regulated speech." *Community for Creative Non-Violence*, supra, at 468 U. S. 293 (emphasis added); *Heffron*, supra, at 462 U. S. 648 (quoting *Virginia Pharmacy Bd.*, supra, at 425 U. S. 771); see *Boos v. Barry*, 485 U. S. 312, 485 U. S. 320-321 (1988) (opinion of O'CONNOR, J.). *Ward v. Rock Against Racism*, 491 U.S. 781, 792 (1989)

Defendants' decision to revoke Plaintiff's permit, but leave in place the permits issued to counter-protestors, ensures that those whose views are favored by City government will have protected, permitted access to two downtown locations and the ability also to occupy Emancipation Park while the City seeks to relegate Plaintiff to McIntire Park, a place a mile from downtown that

5

is unrelated to the message he wants to communicate. Ver. Comp. ¶55 The disparity in treatment between the two groups with opposing views makes clear that the Defendant's decision to revoke Plaintiff's permit was based on the content of his speech rather than other neutral factors that would be equally applicable to Plaintiff and those protesting against Plaintiff.

This conclusion is bolstered by ample evidence in social media and in print that members of City Council oppose Plaintiff's political viewpoint, Ver. Comp.¶48, and the City has expressed a preference for the counter-protesters. Ver. Comp. ¶47.

## B. The City's Action in Revoking Plaintiff's Permit was Not Narrowly Tailored

There must be balance between the ability to have the place of the message be part of the message and legitimate government concerns such as maintaining order or protecting the community against violence. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 294 (where regulation found lawful where it permitted demonstrators to erect symbolic tent cities but did not allow them to sleep in the tents because of the content-neutral prohibition against camping except at specified camp sites). In this case, the message that Plaintiff wishes to communicate concerns the Charlottesville City Council's decision to rename Lee Park and remove the statue of Robert E. Lee currently in the Park. Ver.Comp. ¶¶ 20, 21, 23. Therefore, the place at which the Plaintiff's protest takes place is inextricably linked to the content of the protest message.

Defendants' alleged reason for revoking Plaintiff's permit was information from an unspecified source concerning the number of people likely to attend the demonstration including supporters and opponents. Defendants' asserted that "holding a large rally at Emancipation Park poses an unacceptable danger to public order and safety." Ver. Comp. Exhibit B Defendants' provided no further insight into the information they said had "come to their attention" that prompted either the concern about crowd size or safety. Nor did they provide any insight into why

6

the City was unable to manage a large crowd at a Park at which many events drawing large crowds had previously been held. Ver. Comp. ¶44

Moreover, when Plaintiff offered to work with Defendants to define a solution to their concerns that did not involve moving the demonstration out of Emancipation Park, Defendants would not accept the offer or engage in any dialogue about possible solutions to their concerns about the possible number of attendees. Ver. Comp. ¶53

Under all the circumstances, Defendants' insistence that the only solution to their concerns was for Plaintiff to move his protest away from the focus of his message, the Park and the Lee statue, did not meet the requirement that their solution be narrowly tailored to achieve a legitimate purpose. "It is true that unfounded speculation about potential violence cannot justify an insufficiently tailored restriction on expression." *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 17 (1st Cir. 2004).

**C. The City's Action Empowers the Interests of Hecklers Over the Free Speech Rights of the Plaintiff**

To the extent, the City is relying on the presence of counterdemonstrators as part of its reason for revoking the Emancipation Park permit, it is violating the fundamental principle that the rights of speech and assembly may not be restricted because demonstrators may be met by opposition. There is no place for a "hecklers' veto" under the First Amendment. The "heckler's veto" has been rejected by the Supreme Court of the United States as a legitimate basis for infringing upon First Amendment rights. *Cox v. Louisiana*, 379 U.S. 536 (1965). At the same time, however, the Fourth Circuit has recognized that government officials may restrict expressive activity because of a threat of violence but only if they have a reasonable belief that violence is imminent by those whose expression they seek to restrict. *Christian Knights of Ku Klux Klan*

7

*Invisible Empire, Inc. v. Stuart*, 934 F.2d 318 (4th Cir. 1991) (heckler's veto not involved because real "threat" of violence was from Klan not spectators).

Plaintiff is on record as saying that he "absolutely intends to have a peaceful rally" and that his group would "avoid violence." Ver. Comp. ¶51 The City's letter contains no evidence or even assertion to the contrary. If the City is to meet the standard set by the court in the *Stuart* case, any action it takes to limit Plaintiff's expression because of safety concerns must be based solely on a reasonable belief that violence by Plaintiff and his supporters is imminent and may not be based on a generalized concern that there might be violence at the event for which Plaintiff received a permit.

The City must show more than a generalized concern that a demonstration under the permit poses a threat to public safety. It must show that its decision to revoke and modify Plaintiff's permit was based solely on a reasonable belief that the plans and actions of the "Unite the Right" organizers, not of those who plan to be present in opposition, presented an imminent threat. Otherwise, hecklers and counterdemonstrators could always shut down speech with which they disagree by manufacturing threats to public safety.

**D. The City's Revocation of the Permit Constitutes a Prior Restraint on Plaintiff's Speech and Violates Due Process**

The elimination of prior restraints was a "leading purpose" in the adoption of the First Amendment. See *Lovell v. Griffin,* 303 U.S. 444, at 451-452 (1938). The decision to revoke Plaintiff's permit in advance of the day of the scheduled demonstration constitutes a prior restraint on his speech which is unconstitutional, particularly in the absence of any process by which Plaintiff could contest the Defendants' decision.

8

As the United States Supreme Court underscored in Carrol v. Princess Anne, 393 U.S. 175, 181 (1968) (a case involving the "white supremacist" National States Rights Party),

> "[a] system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." Bantam Books v. Sullivan, 372 U.S. 58, 70(1963); Freedman v. Maryland, 380 U.S. 51, 57 (1965). And even where this presumption might otherwise be overcome, the Court has insisted upon careful procedural provisions, designed to assure the fullest presentation and consideration of the matter which the circumstances permit. As the Court said in Freedman v. Maryland, supra, at 58, a noncriminal process of prior restraints upon expression "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system."

No procedural safeguards were in place to allow Plaintiff to contest the revocation of his permit. Plaintiff was given no opportunity to contest the decision of Defendants, and Defendants made no effort to explain the reasons for the decision other than to state generally a concern for "public safety" based on information from unspecified sources about the expected number of participants. Ver. Comp. ¶¶ 53, 54, 55, 56 and Exhibit B

## II.     The Plaintiff Will Suffer Irreparable Harm Absent Preliminary Relief

If Defendants are not enjoined, Plaintiff will suffer irreparable injury. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The violation of First Amendment rights cannot be fully compensated later by damages. *See, e.g., Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011). In the Fourth Circuit, "[v]iolations of [F]irst [A]mendment rights constitute per se irreparable injury." *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978).

The denial or revocation of the demonstration permit at issue here is a classic case for prompt judicial intervention. And here time is of the essence to protect Plaintiff's rights. Plaintiff's rally is scheduled for this Saturday, August 12. If Defendants are not enjoined before that date, Plaintiff's intended message will not be communicated. In other words, delay would be

9

"tantamount to an effective denial of First Amendment rights." *Fernandes v. Limmer*, 663 F. 2d 619, 628 (5th Cir. 1981), *cert. dismissed*, 458 U.S. 1124 (1982).

### III. The Balance of Equities Favors the Plaintiff

While the Plaintiff will suffer irreparable injury because of the denial of a permit to demonstrate his opposition to the renaming of Emancipation Park and to the removal from the Park of the statue of Robert E. Lee, the City will suffer no harm to its legitimate interests if preliminary relief is granted. Regardless of where the demonstration takes place, the City has an obligation to secure and protect the safety of the demonstrators and the public. In fact, the City is already preparing to provide security at the originally permitted site, erecting "no parking" signs and staging physical barriers. Gasparotto Dec. ¶ 3.

The City's expressed desire to provide security and protection at an alternative site because it would be easier to do so, Ver. Com. Exhibit B, is not a sufficiently substantial governmental interest to override Plaintiff's First Amendment right to express his views in the traditional public forum of a public park. This is particularly true where the City has demonstrated its ability over many years to manage large crowds at various events held in that park (Emancipation Park, formerly Lee Park) and at other downtown locations without incident. Sincere Dec. ¶¶ 2, 3, and 4; Ver. Com. ¶44. Under all the circumstances, the City's expressed concern about the number of potential demonstrators and counter-protesters who might be present is not a legitimate governmental interest but an excuse for treating Plaintiff and his supporters differently and less favorably than those with opposing views.

At the same time, the Plaintiff's ability to communicate his message is negatively affected by the move to a different location even though and where numerous other demonstrations, events and celebrations have taken place in Emancipation Park with numbers of participants in the

10

thousands without incident, and the differentiating factor is the content of the speech or the views of the speakers.

## IV. A Preliminary Injunction is the Public Interest

Courts have repeatedly recognized that the vindication of First Amendment rights is a significant public interest. *See, e.g., Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("upholding constitutional rights surely serves the public interest."); *Christian Legal Society v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("[I]njunctions protecting First Amendment freedoms are always in the public interest."); *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005); *Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest."); *Chabad of Southern Ohio v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) ("the public interest is served by preventing the violation of constitutional rights.").

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the Court issue a temporary restraining order and/or preliminary injunction enjoining the City and the City Manager from revoking or modifying Plaintiff's permit to hold a demonstration in Emancipation Park on August 12, 2017 and that the City and the City Manager be further enjoined to allow the permitted demonstration to go on as planned in Emancipation Park from 12pm to 5pm on that day and to provide such security as may be necessary to protect the rights of the demonstrators and the public.

Respectfully submitted,

Jason Kessler

By Counsel

Dated: August 10, 2017

11

Counsel for Plaintiff

//s// Hope R. Amezquita
Hope R. Amezquita (VSB No. 74629)
Leslie C. Mehta (VSB No. 90437)
American Civil Liberties Foundation of Virginia, Inc.
701 E. Franklin St., Ste. 1412
Richmond, VA 23219
Phone: 804-644-8080
Fax : 804.649.2733
Email : lmehta@acluva.org
Email: hamezquita@acluva.org


//s// Victor M. Glasberg
Victor M. Glasberg (VSB No. 16184)
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
Phone: 703-684-1100
Fax: 703-684-1104
Email: vmg@robinhoodesq.com


John Whitehead (VSB No. 20361)
Douglas R. McKusick (VSB No.72201)
The Rutherford Institute
923 Gardens Boulevard
P.O. Box 7482
Charlottesville, Virginia 22906
Phone : 434-978-3888
Fax : 434-978-1789
Email : johnw@rutherford.org
       douglasm@rutherford.org

12

## CERTIFICATE OF SERVICE

I hereby certify that I emailed the foregoing to all counsel on August 10, 2017, and I will ensure that it is electronically filed with the Clerk of the Court using the CM/ECF system on August 11, 2017, which will send notification of such filing to the following:

S. Craig Brown, City Attorney
City Attorney's Office
P.O. Box 911
Charlottesville, VA 22902
Phone: (434-970-3101)
Fax: 434-970-3101
Email: brownc@charlottesville.org
*Counsel for Defendants*

Respectfully submitted,

//s// Hope R. Amezquita
Hope R. Amezquita (VSB No. 74629)
Leslie C. Mehta (VSB No. 90437)
American Civil Liberties Foundation of Virginia, Inc.
701 E. Franklin St., Ste. 1412
Richmond, VA 23219
Phone: 804-644-8080
Fax : 804.649.2733
Email : lmehta@acluva.org
Email: hamezquita@acluva.org

//s// Victor M. Glasberg
Victor M. Glasberg (VSB No. 16184)
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
Phone: 703-684-1100
Fax: 703-684-1104
Email: vmg@robinhoodesq.com

John Whitehead (VSB No. 20361)
Douglas R. McKusick (VSB No.72201)
The Rutherford Institute
923 Gardens Boulevard
P.O. Box 7482
Charlottesville, Virginia 22906
Phone : 434-978-3888
Fax : 434-978-1789
Email : johnw@rutherford.org
douglasm@rutherford.org

13