# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
## Charlottesville Division

| | |
|---|---|
| JASON KESSLER, | ) |
|     Plaintiff, | ) |
| | ) Case No. 3:17-cv-00056-GEC |
| V. | ) |
| | ) |
| CITY OF CHARLOTTESVILLE and | ) |
| MAURICE JONES, | ) |
|     Defendants. | ) |

## BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION
## FOR A PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER

NOW COME the Defendants, by counsel, and submit the following Brief in opposition to the Motion for a Preliminary Injunction or Temporary Restraining Order filed by Plaintiff Jason Kessler.

### Introduction

The Plaintiff in this action is seeking to compel the City of Charlottesville to allow a massive demonstration in Emancipation Park, a small urban park located in Downtown Charlottesville.[1] While the original application for the demonstration submitted by the Plaintiff, who is the event organizer, stated that there would be 400 attendees, the projected number of

---

[1] While suing the City for permission to use the Park, the Plaintiff apparently feels that injunctive relief from the Court is not necessary. After announcing on his Twitter account that this lawsuit to "reinstate" his permit had been filed, he tweeted that "We go either way".

both demonstrators and counter-demonstrators has increased dramatically over the past month, due largely to the internet-based marketing efforts by the Plaintiff. While he has submitted supplemental requests to the City for the rally since his initial application[2], he has never bothered to update or revise the outdated estimate of 400 people. The City's *conservative* estimate of the number of individuals attending the rally is no less than 1,000, with as many as 2,000 or more counter-demonstrators in attendance. *See* **Affidavit of Charlottesville Chief of Police Al S. Thomas**, attached hereto.

City Manager Maurice Jones has given Mr. Kessler permission to hold the rally in the much larger McIntire Park, but not in Emancipation Park. Mr. Jones's letter stated in pertinent part as follows:

> Your permit application states that the demonstration will consist of approximately 400 people. However, in recent days it has come to the City's attention that many thousands of individuals are likely to attend the demonstration. Because Emancipation Park is a relatively confined space of just over one acre in a densely populated urban area with limited parking space, it is unable to accommodate safely even a peaceful crowd of this size. The City's law enforcement, fire and emergency medical services personnel cannot adequately protect people and property in and around Emancipation Park due to the number of anticipated attendees trying to occupy such a small and confined space. The Police Department also anticipates that the presence of such a large demonstration in Emancipation Park would require the closing of a section of East Market Street, leading to massive traffic congestion and shutting down a principal means of ingress and egress, for the duration of the 5 hour rally.
>
> A large demonstration at McIntire Park does not present the same problems. The use of McIntire Park will still require the deployment of considerable law enforcement resources, but the size, layout and other features of the Park will better enable the City's law enforcement and other emergency personnel to protect the attendees and the public. In contrast, holding such a large rally at Emancipation Park poses an unacceptable danger to public order and safety.

A more complete explanation of the basis for Mr. Jones' action is set forth in the **Affidavit of City Manager Maurice Jones** and the **Affidavit of Charlottesville Fire Chief Baxter**, attached hereto.

---

[2] On July 18 Mr. Kessler requested permission to have "port-o-johns" at the rally. On July 20 he asked for permission to have live music performed at his rally.

In the Complaint, the Plaintiff seems to attach great importance to the fact that other well-attended events have taken place in Charlottesville without being moved to a different location by the City. Those include ticketed events in the Sprint Pavilion, a privately-run music venue, as well as celebratory "festivals" such as the Cville Pride Festival, a "Spring block party", and the Festival of Cultures (Complaint (¶ 40). Upon information and belief none of these events have required the closing of East Market Street. Apparently based solely on crowd estimates from the yearly observations of one individual at one event, the Plaintiff seems to be suggesting that these events and the Unite the Right rally pose the same public safety concerns for the City. The City's public safety officials will disagree. The community impact from different events is not equal. Public Safety officials must make an assessment of each event, including those that are scheduled on the same day as the Unite the Right rally, regarding their potential impact and then act accordingly.

One national civil rights monitoring organization, the Southern Poverty Law Center, has described the magnitude of the August 12th Unite the Right rally in Charlottesville as "what's shaping up to be the largest hate-gathering of its kind in decades in the United States".[3] Even Mr. Kessler, in a recent radio interview, seemed to acknowledge and take pride in the unprecedented size of his event:

[Radio host]: "So let's talk about the beginning stages Jason, what led you to determine that you wanted to organize such an event, and did you think it would become as big as it's apparently becoming?"

[Jason Kessler]: "I'll handle the second half of that first. I absolutely intended it to be as big as possible and it is turning out to be huge. We're on track to get exactly the kind of numbers that we wanted to. We made sure that we got penetration across all our platforms. I did as many podcasts as I possibly could. We made sure it was up on websites like 4chan, on Twitter. We had a lot of great individuals who I haven't

---

[3] https://www.splcenter.org/hatewatch/2017/08/07/extremists-unite-right-rally-possible-historic-alt-right-showcase

even met yet who have done graphic design of brilliant posters and so forth, for it."[4]

The two potential city venues for Mr. Kessler's "huge" event are quite different. Emancipation Park (formerly known as "Lee Park") is located one block from the City of Charlottesville's historic Downtown Mall, and is approximately one square block in size and shape. It contains slightly more than one acre, and is generally devoted to passive activities, although it sometimes serves as the site for various festivals, celebrations and the occasional demonstration. Donated to the City of Charlottesville by Paul Goodloe McIntire in 1917, "the 1.04 acres of raised land provides a pleasant lunchtime oasis in the downtown area, with many benches, a number of tables, and colorful flowers and shrubbery".[5]

In his Complaint (¶ 40) the Plaintiff suggests that Emancipation Park is an appropriate venue for a rally by calculating that at least 21,780 people can fit into Emancipation Park, when arranged shoulder-to-shoulder and without considering the Lee statue, trees, sidewalks, flowerbeds and landscaping, benches and open areas necessary to keep demonstrators and counter-demonstrators apart. It is equally true that 7 billion people, almost everyone on Earth, can fit into the City of Los Angeles, California[6], but no one would suggest that they all meet there for a rally.

McIntire Park, in both size and use, is the City's primary municipal park:

McIntire Park contains land originally donated by Paul Goodloe McIntire and other lands purchased from multiple property owners, and continues to be one of the most popular parks in the City. Located off U.S. Route 250 Bypass, it features rolling land with magnificent views of the mountains to the east, a heavily wooded area with steep and varied topography and winding streams. There is a major community focus on the lighted softball fields, baseball field, and the three shelters which are used extensively

---

[4] Reported at http://restoringthehonor.blogspot.com/2017/07/jason-kessler-tells-white-nationalist.html
[5] From the City's website: http://www.charlottesville.org/departments-and-services/departments-h-z/parks-recreation-/parks-trails/city-parks/emancipation-park-formerly-known-as-lee-park
[6] http://news.nationalgeographic.com/news/2011/10/111031-population-7-billion-earth-world-un-seven/

4

from spring to fall. In April every year McIntire Park hosts the carnival for the Annual Dogwood Festival.[7]

There are reasons why the carnival for the Annual Dogwood Festival is held at McIntire Park every year rather than at Emancipation Park, or at any of the other smaller City parks. The size, location, layout, ingress and egress and parking make McIntire Park uniquely suited among City public parks to accommodate a gathering well in excess of 1,000 people. Those same reasons require the Unite the Right rally to be held at McIntire Park.

**Argument**

I.      **The Standard for the Grant of Preliminary Injunctive Relief**

The standard for the granting of preliminary injunctive relief is well established. As stated by the court in International Refugee Assistance Project v. Trump, 857 F.3d 554, 588 (4th Cir. 2017), *stay granted in part,* ___ U.S. ___, 137 S. Ct. 2080 (2017),

> A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power" and is "to be granted only sparingly and in limited circumstances." MicroStrategy, Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001) (*quoting* Direx Israel, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802, 816 (4th Cir. 1991)). For a district court to grant a preliminary injunction, "a plaintiff 'must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." WV Association of Club Owners & Fraternal Services, Inc. v. Musgrave, 553 F.3d 292, 298 (4th Cir. 2009), *quoting* Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365 (2008).

"All four requirements must be satisfied to obtain the 'extraordinary remedy' of a preliminary injunction". JAK Products v. Bayer, 616 Fed. Appx. 94, 95 (4th Cir. 2015); *see also* Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013) ("courts considering whether to impose preliminary injunctions must separately consider each *Winter* factor").

---

[7] From the City's website: http://www.charlottesville.org/departments-and-services/departments-h-z/parks-recreation-/parks-trails/city-parks/mcintire-park

5

## II. Plaintiff Is Not Likely To Succeed On The Merits Of His First Amendment Claim

While a party seeking a preliminary injunction is not required to show a "certainty of success", the movant must make a "clear showing" that he or she is likely to succeed at trial. Pashby v. Delia, *supra*, 709 F.3d at 321. In this case the plaintiff will be unable to make that "clear showing" of a likelihood of success with respect to an alleged violation of the First Amendment.

Municipal parks, like Emancipation Park and McIntire Park, are routinely recognized as traditional public forums for speeches and other transitory expressive acts. *See, e.g.,* Pleasant Grove City v. Summum, 555 U. S. 460, 464, 129 S. Ct. 1125 (2009). While the government's ability to regulate speech in locations such as public streets, sidewalks and parks is limited, courts have:

> . . . afforded the government somewhat wider leeway to regulate features of speech unrelated to its content. "[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'"

McCullen v. Coakley, ___ U.S. ___, 134 S. Ct. 2518, 2529 (2014) (citations omitted). In this case City Manager Jones' decision was justified without reference to speech content or the Plaintiff's viewpoint, it was narrowly tailored to serve a significant governmental interest, and it left open ample alternative channels for communication.

### The City Manager Made a Content-Neutral Decision to Allow the Rally in McIntire Park But Not in Emancipation Park

6

Perhaps seeking to justify a more exacting level of judicial scrutiny of the City's action, the Plaintiff has claimed that the decision to issue a demonstration permit for McIntire Park "was based on his viewpoint and was not necessary to achieve any compelling government interest" (Complaint ¶ 61), or was not content neutral because it was driven by the prospect of a "heckler's veto" (Complaint ¶ 38). The Complaint acknowledges that the Plaintiff and his lineup of speakers can express their viewpoints at McIntire Park for the desired 5 hours, and that others with the same or similar viewpoints as the Plaintiff have recently held rallies or demonstrations in the City.

Stated succinctly, the heckler's veto is rooted in the premise that "listeners' reaction to speech is not a content-neutral basis for regulation." Forsyth County v. Nationalist Movement, 505 U.S. 123, 134, 112 S. Ct. 2395 (1992). It has been recognized as an especially serious form of content-based discrimination when it is "designed to exclude a particular point of view from the marketplace of ideas". Bible Believers v. Wayne County, 805 F.3d 228, 248 (6th Cir. 2015) (unconstitutional to cut off and terminate protected speech because of hostile crowd reaction); *see also* Santa Monica Nativity Scenes Committee v. City of Santa Monica, 784 F.3d 1286, 1293 (9th Cir. 2015) ("The prototypical heckler's veto case is one in which the government silences *particular* speech or a *particular* speaker due to an anticipated disorderly or violent reaction of the audience" (emphasis in original)); Padgett v. Auburn University, 2017 U.S. Dist. LEXIS 74076 (M.D. Ala. 2017) (enjoining the cancellation of a speech when it was based on anticipated student reaction); Swagler v. Sheridan, 837 F. Supp. 2d 509, 526 -527 (D. Md. 2011) (state troopers improperly ordered anti-abortion protesters to "leave the county" because of the public's reaction to their offensive signs). The government's consideration of the public's response to protected speech is not, however, *ipso facto* a violation of the First Amendment right of free

speech. *See, e.g.,* Rock for Life-UMBC v. Hrabowski, 411 Fed. Appx. 541, 552 - 553 (4th Cir. 2010) (where defendants were motivated by both content-based and content-neutral reasons, no constitutional violation occurs if the government can show by a preponderance of the evidence that it would have taken the same action for other, constitutionally proper, reasons); Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. Stuart, 1991 U.S. App. LEXIS 11312 (4th Cir. 1991) (Klan was lawfully excluded from the town's Christmas parade because the town's officials had a reasonable belief that their participation would cause an imminent danger to public safety).

The Complaint does not contain sufficient allegations to support a claim that the City and Mr. Jones were motivated by fears about how counter-protesters will respond to the Plaintiff's rally. The Plaintiff only cites (Complaint ¶ 38) the following unremarkable statement by "the City":

> In explaining its plans to prepare for rallies at both Emancipation Park and McIntire Park, the City explained that "[w]ith large crowds of individuals with strongly held and potentially opposing beliefs, there is also the potential for conflict.

The fact that there is potential for conflict at both Parks does not support Plaintiff's claims that he was sent to McIntire Park due to concerns about the response of counter-protesters.

In McCullen v. Coakley, *supra,* the plaintiffs challenged the constitutionality of an amendment to a state statute that made it a crime to knowingly stand on a public way or sidewalk within 35 feet of an entrance or driveway to any health care facility where abortions are performed. The law had originally been enacted "to address clashes between abortion opponents and advocates of abortion rights that were occurring outside clinics where abortions are performed". In considering the claim that the law was a violation of the First Amendment, the Court first responded to the contention that the law was not "content neutral", because the buffer

8

zone requirement applied only at clinics where abortions are performed. After noting that the law "does not draw content-based distinctions on its face" but "may disproportionately affect speech on certain topics", the Court found the law to be content-neutral:

> The question in such a case is whether the law is "'justified without reference to the content of the regulated speech.'" . . .The Massachusetts Act is. Its stated purpose is to "increase forthwith public safety at reproductive health care facilities." 2007 Mass. Acts p. 660. Respondents have articulated similar purposes before this Court—namely, "public safety, patient access to healthcare, and the unobstructed use of public sidewalks and roadways." . . . It is not the case that "[e]very objective indication shows that the provision's primary purpose is to restrict speech that opposes abortion."
>
> We have previously deemed the foregoing concerns to be content neutral. See Boos, 485 U.S. at 321, 108 S. Ct. 1157, 99 L.Ed. 2d 333 (identifying "congestion," "interference with ingress or egress," and "the need to protect . . . security" as content-neutral concerns). Obstructed access and congested sidewalks are problems no matter what caused them. A group of individuals can obstruct clinic access and clog sidewalks just as much when they loiter as when they protest abortion or counsel patients.
>
> To be clear, the Act would not be content neutral if it were concerned with undesirable effects that arise from "the direct impact of speech on its audience" or "[l]isteners' reactions to speech. . . . All of the problems identified by the Commonwealth here, however, arise irrespective of any listener's reactions. Whether or not a single person reacts to abortion protestors' chants or petitioners' counseling, large crowds outside abortion clinics can still compromise public safety, impede access, and obstruct sidewalks.

McCullen, 134 S .Ct. at 2531 – 2532; *see also* Reed v. Town of Gilbert, ___ U.S. ___, 135 S. Ct. 2218, 2226 (2015) (The "commonplace meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys"); Stop Hillary PAC v. Federal Election Commission, 166 F. Supp. 3d 643, 650 (E.D. Va. 2015) (because the challenged regulation did not target speech based on its communicative content, it was not content based and plaintiffs were therefore unlikely to succeed on the merits of their claim).

In this case, section 3.4.5 of the City's Standard Operating Procedures for Special Events and Demonstrations allows a permit to be denied for "Incompatible Use: the proposed demonstration or special event is of such a nature or duration that it cannot reasonably be accommodated in the particular area applied for; would be inconsistent or incompatible with the purpose(s) for which the area sought to be reserved is normally reserved, or with other uses of the public area". The regulations do not allow a permit to be denied based on the content of the message being delivered or the viewpoints of the speaker, nor because the message might be met with a hostile reaction. The City is not attempting to silence Mr. Kessler, nor his supporters who will be attending the rally. *It should be obvious that the City did not offer the Plaintiff a larger, more accessible venue with free parking for his rally because of a disagreement with the message he wants to convey.*

According to his Complaint the Plaintiff's "message" or viewpoint is opposition to the "policy decisions" regarding the removal of the Robert E. Lee statue from Emancipation Park, and the renaming of Emancipation Park (Complaint ¶¶ 21, 29, 31). As evidence of the Defendants' animus against that viewpoint, the Plaintiff alleges that the "City has expressed a preference for the counter-protesters." (Complaint ¶ 47). But at the same time the Complaint acknowledges that just one month ago the City dispersed those counter-protesters with tear gas at a rally of the Loyal White Knights of the Ku Klux Klan (Complaint ¶ 41). Regarding Mr. Jones' alleged "preference" for the counter-protesters, the Complaint notes that when he was speaking at a public meeting in July the counter-demonstrators disrupted the meeting by yelling "liar" at him (Complaint ¶ 49).

The remaining allegations that allegedly support the Plaintiff's viewpoint discrimination claim are public comments by individual members of City Council, which allegedly "made clear

10

their opposition to Plaintiff's political viewpoint" (Complaint ¶ 48). First, the elected representatives of the people of Charlottesville do not lose their right to speak out on important issues when they assume office. To the contrary, they are entitled to choose the message they wish to convey to their constituents, and are under no obligation to remain neutral on contentious issues. "[I]t is not easy to imagine how government could function if it lacked th[e] freedom" to select the messages it wishes to convey. Walker v. Texas Division, Sons of Confederate Veterans, Inc., __ U.S. ___, 135 S. Ct. 2239, 2246 (2015). Second, the Plaintiff is relying on comments made by individual City Council members, and not on a position taken by the Council as a body. In Virginia the powers of a locality are vested in its governing body, which takes action by majority vote. Virginia Code §§ 15.2-1401 and 1420.

The City's motivations behind the approval of McIntire Park over Emancipation Park were many of the same substantial and legitimate governmental interests that the Court acknowledged in McCullen. The concerns articulated in Mr. Jones' letter to Mr. Kessler, quoted above, are not only content neutral, they also represent compelling state interests. In Blasecki v. Durham, 456 F.2d 87 (4th Cir. 1972), the plaintiffs challenged an ordinance that prohibited more than 50 people from assembling or congregating at a specific public park. The court had "no difficulty" in identifying a compelling governmental interest in the subject matter:

> The state's interest in the protection of property is a compelling one. So also is its interest that there will not be prolonged and uncontrolled congestion of main downtown arteries of vehicular and pedestrian traffic. Five Points is to Durham what Times Square is to New York. Prolonged and uncontrolled blockage of traffic at such a point can paralyze a city. See Cox v. Louisiana, *supra*, 379 U.S. at 554, 85 S. Ct. at 464, where the Court said, "Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly." This is not a case of abridgment of the privilege of a citizen to use the streets and parks for political discussions "in the guise of regulation. . . ." Haque v. Committee for Industrial Organization, 307 U.S. 496, 515-516, 59 S. Ct. 954, 964, 83 L. Ed. 1423 (1939)..

Id at 91-92.

More recently in Ross v. Early, 746 F.3d 546 (4th Cir. 2014), the court considered a First Amendment challenge by a protester who had been arrested twice outside of an arena for refusing to move to a designated protest area. Again, the Fourth Circuit found a clear compelling governmental interest at stake:

> Our jurisprudence makes clear that a city's interest "'in maintaining the safety, order, and accessibility of its streets and sidewalks'" is sufficient to justify a time, place, and manner regulation. Green v. City of Raleigh, 523 F.3d 293, 301 (4th Cir. 2008) (quoting Cox v. City of Charleston, 416 F.3d 281, 284 (4th Cir. 2005). Indeed, as described by the Supreme Court, "municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for the movement of people and property, the primary purpose to which the streets are dedicated." Schneider v. State of New Jersey, 308 U.S. 147, 160, 60 S. Ct. 146, 84 L. ed. 155 (1939). On this strength of authority, we have little trouble concluding the City's asserted interest in maintaining the flow of pedestrian traffic and ensuring public safety qualifies as "substantial."

Id at 555.

The fact that the City Manager's decision was content neutral and serves an important and substantial governmental interest does not conclude the First Amendment analysis. A reasonable restriction on the time, place, or manner of protected speech must also be narrowly tailored to meet the significant governmental interest, and leave open ample alternative channels for communication. McCullen v. Coakley, *supra,* 134 S. Ct. at 2529.

The Demonstration Permit for McIntire Park is Narrowly Tailored to Meet the City's Substantial Interest, and Represents an Ample Alternative Channel for Communication.

Pursuant to the approval granted in the City Manager's letter Mr. Kessler can have his Unite the Right rally on the day he wants, for the time period he wants, and with as many attendees as he can attract. The only restriction is location – at McIntire Park the Plaintiff will not have the Robert E. Lee statue as a backdrop. While the Emancipation Park location may have some significance to Mr. Kessler, there is no absolute constitutional right to claim the use of a specific venue for a specific purpose at a specific time. There is no reason to suspect that the audience the Plaintiff seeks to attract will be less likely to attend a rally in McIntire Park than

in Emancipation Park. The Plaintiff, however, alleges that "the message of the rally" (Complaint ¶ 21) is opposition to the removal of the Lee statue and renaming of the Park. That allegation is not borne out by the description of the goals for the rally as described on the Unite the Right Rally Facebook page, presumably authored by the Plaintiff:

> This is an event which seeks to unify the right-wing against a totalitarian Communist crackdown, to speak out against displacement level immigration policies in the United States and Europe and to affirm the right of Southerners and white people to organize for their interests just like any other group is able to do, free of persecution.[8]

The discussion of each of those topics is entitled to the full panoply of First Amendment protections, and can be made as forcefully in McIntire Park as in Emancipation Park.

The City's decision with regard to Emancipation Park is driven by two dynamics, neither of which it can control: the physical size and location of the Park, and the number of people expected to attend the Unite the Right rally. The City cannot increase the available space around the Park, nor prevent people from attending the event. Interestingly, when Mr. Kessler discussed the issue of crowd size with City representatives, he impliedly acknowledged the problem by suggesting that perhaps the City could assist him in limiting the number of people who were allowed into Emancipation Park. Other than suggesting the exclusion of members of the Ku Klux Klan and people wearing swastikas, Kessler was unable to suggest how his "plan" could be effectively administered by the City. In addition to the obvious practical and constitutional issues from selectively excluding individuals from public areas, the Plaintiff offered no explanation of how his solution would reduce the number of people attending the event in and around Emancipation Park. There is no reason to suspect that any of the people excluded from the Park proper would simply leave and go home.

---

[8] https://www.facebook.com/events/137857813439031/

13

The court's decision in MacDonald v. City of Chicago, 243 F.3d 1021 (7th Cir. 2001) is particularly relevant regarding the availability of an alternate location for the exercise of free speech rights. In MacDonald the City rejected an application for a parade permit along a specific route because it would substantially and unnecessarily interfere with traffic; there would be an insufficient number of peace officers to police and protect participants; and the nature of the parade would prevent proper fire and police protection and ambulance service. The City did, however, offer to approve an alternate route for the parade as contemplated by the City's parade ordinance. The City upheld the City's action as a reasonable time, place and manner regulation:

> However, contrary to the dissent's concern, the Chicago ordinance bars no one from marching; rather, if the City determines that traffic hazards are too great and police protection insufficient for that time and place, then the City must "authorize the conduct of a parade, public assembly or athletic event on a date, at a time, at a location, or over a route different than that named by the applicant. This alternate permit shall to the extent practicable authorize an event that will have comparable public visibility and a similar route, location and date to that of the proposed event." Municipal Code of Chicago, Ill. § 10-8-330(l). Because the City must authorize the parade or other event, hecklers cannot veto unpopular speech "by threatening to show up in large numbers and create traffic hazards of their own."

243 F.3d at 1033. The court also reasoned that the alternate route requirement "ensures ample alternative channels of communication," and it "assures that the ordinance is narrowly tailored to the City's interests by requiring the next-best route be offered to the applicant. Moreover, absent this ordinance, the City could be in disarray, with marchers interrupting the flow of workers and sightseers, delivery trucks, buses, and emergency vehicles, as well as other marchers deciding to rally at the same place and on the same day. The government's interest in organizing these potential disruptions would 'clearly be achieved less effectively absent the regulation'." Id at 1034.

The approval of McIntire Park for the Unite the Right rally will enable Mr. Kessler's right of free speech in ways that Emancipation Park cannot. The larger venue will accommodate

more people than Emancipation Park, it is more easily accessible if large numbers of people attend the rally, and there is ample free off-street parking which is not available anywhere in close proximity to Emancipation Park.  For the reasons stated herein, the plaintiff cannot make a clear showing that he is likely to succeed on the merits of his First Amendment claim.

### III. The Plaintiff Will Not Suffer Irreparable Harm If the Unite the Right Rally Takes Place in McIntire Park

The well-established rule in the United States Court of Appeals for the Fourth Circuit is that the loss of First Amendment freedoms, even for minimal periods of time, constitutes irreparable injury.  Legend Night Club v. Miller, 637 F.3d 291, 302 (4th Cir. 2011).   However, for purposes of a preliminary injunction the inquiry does not end there.  As stated by the court in Hohe v. Casey, 868 F.2d 69, 72 – 73 (3rd Cir. 1989):

> But the assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits. . . . Rather the plaintiffs must show "a chilling effect on free expression" . . . It is "purposeful unconstitutional [government] suppression of speech [which] constitutes irreparable harm for preliminary injunction purposes." . . . Accordingly, it is the "direct penalization, as opposed to incidental inhibition, of First Amendment rights [which] constitutes irreparable injury." . . . Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction.

The speech of Mr. Kessler and his associates will not be suppressed by holding the Unite the Right rally in McIntire Park.  The size of the audience will not be limited, and the duration of the rally will be as requested.  The sole limitation on Mr. Kessler is the inability to hold the rally at his first choice of location.  There is no "chilling effect on free expression", nor any "direct penalization" of First Amendment rights.  Since the City's reasonable regulation regarding the place of the event is <u>at most</u> an incidental inhibition of Constitutional rights, the Plaintiff cannot show the requisite irreparable harm required to support a preliminary injunction.

15

## IV. The Balance of Equities and the Public Interest Do Not Support the Granting of Preliminary Injunctive Relief

When a preliminary injunction is sought against the government or other public institutions or public servants it is appropriate to consider together the final two elements of the preliminary injunction analysis – the public interest and the balance of the equities. *See, e.g.,* Mineral Run Oil Co. v. United Forest Service, 670 F.3d 236 (3rd Cir. 2011); Spiegel v. Houston, 636 F.2d 997 (5th Cir. 1981).

With regard to the underlying equities, the City has not attempted to silence Mr. Kessler or the speakers he may have arranged, but rather has provided him with a forum suitable for the rally he wishes to hold. The City Police Department has pledged to devote substantial resources to protect him, regardless of where the rally takes place. The Complaint (¶ 34) accurately alleges that "the City Police Department is now preparing for the possibility that people will gather at both parks during the rally", primarily because the Plaintiff has publicly and defiantly proclaimed that he would not only sue the City, but would have the Unite the Right rally in Emancipation Park regardless of any of the City's concerns, or the ruling of the court.[9] That disregard for the legitimate safety concerns of the City should not be rewarded with equitable relief.

The Plaintiff has offered no practical solutions to the serious problems the size of his rally will cause if held in Emancipation Park. Since filing his application for a permit he has apparently spent considerable time and attention trying to attract the largest crowd possible to his rally, while never bothering to amend his application or to inform the City of the widespread interest in attending the rally. The City was left to devote considerable resources to determine a reasonable estimate of the potential crowd size. While stating to local media outlets that he

---

[9] *See* footnote 1, *supra.*

"intends to have a peaceful rally" of about 400 people who will "avoid violence" (Complaint ¶ 51), in other forums he has reportedly said it will "be like Berkeley"[10] with "thousands of people out here".  The balancing of the equities does not favor the granting of preliminary injunctive relief.

As a broad principle, upholding constitutional rights serves the public interest.  *See, e.g.,* Doe v. Pittsylvania County, 842 F. Supp. 927, 936 (W.D. Va. 2012).  In this case, however, it is the City authorities who, as "trustees of the public", Ross v. Early, *supra*, 746 F.3d at 555, have the solemn duty to keep this community safe.  That obligation frequently entails difficult and complex judgment calls that balance many competing interests.  In his request for a preliminary injunction the Plaintiff is asking the Court to substitute its judgment on critical public safety issues for that of the City, before the development of a complete factual record.  In Vollette v. Watson, 2012 U.S. Dist. LEXIS 103322 (E.D. Va. 2012), six former jail contractors sought to compel a Sheriff to reinstate their security clearances.  While the court found that the plaintiffs failed to make a clear showing on the likelihood of success on their First Amendment claim, it nevertheless addressed the question of whether a preliminary injunction would be in the public interest.  After noting that courts, as a general rule, are "loathe to second guess the difficult judgment calls regarding security that are made by prison and jail administrators", the court concluded that:

> Entry of such extraordinary relief, on undeveloped facts, absent a clear showing of irreparable harm, would <u>not</u> be in the public interest because it would risk substituting the Sheriff's difficult judgment call with a viewpoint of the Court that could be predicated on erroneous facts.

Id.  (emphasis in original).  For the same reasons the entry of preliminary injunctive relief in this case would not be in the public interest.

---

[10] The reference is seemingly to the series of violent protests and clashes this year at the University of California at Berkley between groups of extremists at both ends of the political spectrum.

## V. The Court Should Not Consider the Argument Regarding a Prior Restraint on Plaintiff's Constitutional Rights

In the Memorandum supporting the Motion for a temporary injunction the Plaintiff argues that the City's permit regulations are a prior restraint on Plaintiff's constitutional rights. That argument is not based on any allegation in the Complaint, and should therefore not be considered as a basis for the granting of preliminary injunctive relief.

## Conclusion

For the reasons cited herein the Defendants respectfully request that the Plaintiff's Motion for a Preliminary Injunction be denied. If the Plaintiff's Motion for a Preliminary Injunction is granted, the Defendants respectfully request that pursuant to Fed. R. Civ. Pr. 65 (c), the Plaintiff be required to give security in an amount that the Court considers proper to pay the costs and damages that may be sustained by the City if the City is found to have been wrongfully enjoined.

Respectfully submitted,

City of Charlottesville and
Maurice Jones
By Counsel

//s// S. Craig Brown
S. Craig Brown (VSB # 19286)
City Attorney
P.O. Box 911
605 East Main Street
Charlottesville, VA  22902
Tel. (434) 970-3131
Fax: (434) 970-3022
Email: brownc@charlottesville.org

Counsel for Defendants

**CERTIFICATE OF SERVICE**

       I hereby certify that I e-mailed the foregoing to all counsel on August 11, 2017, and I will ensure that it is electronically filed with the Clerk of the Court using the CM/ECF system on August 11, 2017, which will send notification of such filing to the following:

Hope R. Amezquita (VSB #74629)
Leslie C. Mehta (VSB No. 90437)
American Civil Liberties Foundation of Virginia, Inc.
701 E. Franklin Street, Suite 1412
Richmond, VA 23219
Phone: 804-644-8080; Fax: 804-649-2733
E-mail: lmehta@acluva.org
E-mail: hamezquita@acluva.org

Victor M. Glasberg (VSB No. 16184)
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
Phone: 703-684-1100; Fax: 703-684-1104
E-mail: vmg@robinhoodesq.com

John Whitehead (VSB No. 20361)
Douglas R. McKusick (VSB No. 72201)
The Rutherford Institute
923 Gardens Boulevard
P.O. Box 7482
Charlottesville, Virginia 22906
Phone: 434-978-3888; Fax: 434-978-1789
E-mail: johnw@rutherford.org
        douglasm@rutherford.org

                              Respectfully submitted,

                              //s// S. Craig Brown
                              S. Craig Brown (VSB No. 19286)
                              City Attorney, City of Charlottesville, Virginia
                              P.O. Box 911
                              605 East Main Street
                              Charlottesville, Virginia 22902
                              Phone: 434-970-3131; Fax: 434-970-3022
                              E-mail: brownc@charlottesville.org