IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| JASON KESSLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 3:17-cv-56 |
| | ) |
| CITY OF CHARLOTTESVILLE, | ) |
| MAURICE JONES, | ) |
| | ) |
| Defendants. | ) |

### BRIEF *AMICUS CURIAE* OF JOHN KLUGE, ALIGHT FUND LLC, DAVID POSNER, AND HUNTER SMITH

Pursuant to Rule 29 of the Federal Rules of Civil Procedure, subject to obtaining leave of Court, John Kluge, Alight Fund LLC, David Posner, and Hunter Smith, by counsel, hereby submit their *amicus curiae* brief in the above styled matter in support of the position of the City of Charlottesville, as follows:

Each of the *amici curiae* does business and has his principal offices in the City of Charlottesville, Virginia. Alight Fund LLC and John Kluge, its co-founder and managing partner, have their principal office at 123 East Main Street. David Posner is a downtown entrepreneur, with his principal office at 600 East Water Street. Hunter Smith is the owner of Champion Brewing and co-owner of Brasserie Saison, with principal offices at 324 6th Street SE and 111 E Main Street respectively. The *amici curiae* are paying counsel for the preparation and submission of this brief. No other person or entity contributed money that was intended to fund the preparation or submission of this brief. This brief was prepared entirely by counsel for the *amici curiae*.

1

## PRELIMINARY STATEMENT

This brief is written in response to the Expedited Motion for a Preliminary Injunction and/or Temporary Restraining Order filed by the Plaintiff against the City of Charlottesville (the "City") and Maurice Jones, seeking to enjoin the City from requiring the Plaintiff to move his planned demonstration from Emancipation Park (formerly Lee Park) to McIntire Park, both locations being in the City.

## STATEMENT OF FACTS

The *amici curiae* hereby adopt the statement of facts contained in the brief submitted herein by the City, with the following additions:

The offices each of the amici Curiae are in the downtown area. The offices of John Kluge and Alight Find LLC, at 123 East Main Street, are approximately fifty yards from the southern edge of Emancipation (Lee) Park. The back door to the premises of Brasserie Saison, at 111 E. Main Street, is even closer. Messrs. Posner and Smith were among forty-three merchants and business persons who signed a joint letter to the City expressing their concerns about and opposition to the holding of the subject demonstration at Emancipation Park.

The subject area of downtown Charlottesville is especially busy on Saturdays with many shoppers, tourists, residents and workers traversing the area on foot and in vehicles. Estimates of attendance at the subject demonstration continue to grow and it appears the crowd will add in the range of an additional two thousand persons. The risk to the safety of those who are simply attempting to negotiate that area for other purposes (i.e. customers of *amici curiae*) is a matter of great concern. Even if the event remains peaceful, the sheer number of persons expected to be in the area, most of whom will be energetically expressing contrasting views, presents a danger of

injury to persons and property outside the proposed site. Moreover, such a crowd will make it extremely difficult for medical and other emergency personnel to negotiate the crowd in order to get to the point of needed assistance, both within the crowd and beyond.

Moving the demonstration away from the congested downtown area to McIntire Park, an alternative public venue with ample space to accommodate a crowd of that size or even significantly larger, will both provide a safer alternative and at the same time do nothing to affect the actual content of the participants' free speech.

The *amici curiae* value the rights of all persons to exercise free speech, whether or not they agree with the content of that speech. Their sole concern is the protection of the safety of all persons, whether or not voluntarily participating in the demonstration, the security of property and the free flow of pedestrian and vehicular traffic in the downtown area.

**ARGUMENT**

The criteria for evaluating the permissibility of governmental regulations that may affect free speech under the Supreme Court's "time, place, and manner" jurisprudence have been repeatedly articulated:

> Our cases make clear, however, that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984); see *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 648 (1981) (quoting Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771 (1976)).

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

3

As described by his verified Complaint, Plaintiff seeks to combine both speech and non-speech elements: (1) "to protest in a public park", which includes a line-up of speakers from various organizations, and (2) to engage in expressive conduct by demonstrating in front of the Robert E. Lee statue. (Compl. ¶2-3). As the City has indicated it remains willing to permit the demonstration in McIntire Park, the first element is not at issue.

The only question is whether the City can "restrict" Plaintiff's expressive conduct by requiring the change in venue. On this point, the Supreme Court is clear: "the Government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." Texas v. Johnson, 491 U.S. 397, 406 (1989). "Where the governmental interest in question be unconnected to" the expressive conduct, it falls "under O'Brien's less demanding rule." Id., *citing* United States v. O'Brien, 391 U.S. 367 (1968).

As discussed below, there is no reasonable doubt that the City's action – merely relocating the demonstration from one public park to another close by – meets this test.

1.  The Action Was Content Neutral.

As to the first criterion, the action was clearly content neutral in that it imposed no content restrictions whatsoever and thus is subject to intermediate scrutiny. The Action of the City regulates the location of the Plaintiff's demonstration for reasons of public safety and has nothing to do with what speech the Plaintiff intends to exercise. In the words of the Fourth Circuit: "[b]ecause the [City's action] regulates speech for reasons independent of content, it is a content neutral restriction subject to intermediate scrutiny. Applying that scrutiny. . . the ordinance does not violate the First Amendment." *Brown v. Town of Cary*, 706 F.3d 294, 297,

2013 U.S. App. LEXIS 1423, *2 (4th Cir. 2013) ("the legislative intent of the [city's] Sign Ordinance is to promote aesthetics and traffic safety" not content, and "[t]he regulations are specifically intended to: Preserve the character and quality of residential neighborhoods").

2.  <u>The City's Action Is Narrowly Tailored to Serve a Significant Government Interest</u>.

The City's action is aimed solely at: having the planned demonstration take place at a location where the large numbers of persons attending can be accommodated in as safe a manner as possible; assuring that any possible outbreak of violence can be contained and dealt with safely and effectively; protecting the property of the City's residents and merchants and keeping the City's streets and walkways open to traffic.

In the present case, the City has indicated that it will issue Plaintiff his requested permit, granting the date, hours and proposed mode (amplified voices) of demonstration. However, based on the expected turnout, the City has indicated that it will only grant the permit if the demonstration is moved to McIntire Park, as Emancipation (formerly Lee) Park is too small to accommodate the number of attendees without requiring that Market St. and W. Jefferson St. be closed for the bulk of the day (in addition to planned closures of 1st St. N and 2nd St. NE).

3.  <u>The Size Of The Crowd Is Expected To Exceed The Capacity Of Emancipation Park And Presents Major Risks to Safety And Security.</u>

In determining that the number of protestors is likely to exceed the capacity of Emancipation Park, the City is justified in relying on the following:

i)  As of 4 PM on August 10, 2017, the Facebook page for the Unite the Right Free Speech Rally indicated that 727 individuals have responded that they are attending the rally. While some of these may ultimately not attend (though the comments below are full of carpooling discussion and lodging requests), this number counts only those with Facebook accounts who are attending in support of Plaintiff's demonstration.

ii) This is in line with the number of attendees expected by at least one publication sympathetic to the demonstrators and reporting on the planned attendance: "A conservative estimate would put us at about 500, although if the Daily Stormer book clubs, frog twitter, and affiliated groups come through, we can top 1000." https://altright.com/2017/08/05/the-unite-the-right-rally-is-going-to-be-a-turning-point-for-white-identity-in-america/

iii) The following groups have announced that they will be attending in support of Plaintiff's demonstration:

    a. Identity Evropa

    b. Vanguard America

    c. Traditionalist Worker Party

    d. National Socialist Movement

    e. Fraternal Order of Alt-Knight

    f. League of the Sout

iv) The City reasonably expects a large number of counter-protestors to attend. A July 8, 2017 rally organized by the Loyal White Knights of the Ku Klux Klan attracted approximately 50 demonstrators and more than 1,000 counter-protestors.[1]

Should the Court conduct an evidentiary hearing in this matter, we believe the evidence will clearly show that the activities of the crowd on that day were at the outer limits of the ability of the City's police department to deal with in that location; that it could not be contained within the confines of either Emancipation Park or Justice Park and that large numbers of demonstrators spilled out into the streets of downtown, ultimately resulting in a confrontation between some of

---

[1] https://www.usatoday.com/story/news/nation-now/2017/07/08/kkk-holds-rally-virginia-and-met-rotesters/462146001/

the demonstrators and the police. The economic impact to merchants from customers refusing to come into the area was substantial. The estimated attendance at the upcoming rally and demonstration is several times the size of that demonstration. Cramming so many people who are dealing with a highly emotional and stressful situation into that limited area is impossible without major spill-over into the streets and other areas creating an untenable situation. The Emancipation Park area contains many residents and is situated close to other residential areas. The situation could quickly overwhelm not only the location, but the resources of a police department the size of that of the City of Charlottesville.

The City's expectation that more than 1,500 people will attend this demonstration (both pro- and con) is therefore reasonable under the circumstances, and justifies the minimal restriction on the place of the demonstration.

4. <u>The City's Action Leaves Open Ample Alternative Channels For Communication Of Information</u>.

Moving the rally to McIntire Park places it still well within the central area of the City in a much larger and more open public area, where the danger to people and property can better be contained and, if need be, dispersed. McIntire Park is located along the 29/250 By-Pass, the major east/west thoroughfare through the heart of the City. It is open and visible to traffic along that route and contains ample parking. In many ways this venue would enhance the ability of all concerned to exercise their right to free speech in a safer public environment.

5. <u>The Symbolic Significance Of The Planned Location Does Not Alter This Analysis</u>.

Plaintiff argues that the purpose of his demonstration is to protest the City's intended removal of the Lee statute from the former Lee Park, making the place of the demonstration part of his protected expression. Even assuming this is true (and it does not appear to be) the City is not required to grant the permit at a location for which it has facially valid and good faith reasons

7

to prohibit. "A message may be delivered by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative." *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 294 (1984), citing *Spence v. Washington*, 418 U.S. 405 (1974); *Tinker v. Des Moines School District*, 393 U.S. 503 (1969). Symbolic expression of this kind may be forbidden or regulated if the conduct itself may constitutionally be regulated, if the regulation is narrowly drawn to further a substantial governmental interest, and if the interest is unrelated to the suppression of free speech. *Clark*, 468 U.S. at 294, citing *United States v. O'Brien*, 391 U.S. 367 (1968). As demonstrated above, this criterion has been met by the City.

Plaintiff's argument that the location is inextricably intertwined with the purpose of the demonstration is not born out by the facts. Plaintiff's own words belie that the demonstration is primarily about the removal of the Lee statute. In a video posted to his Twitter account on August 7, 2017, Plaintiff stated that the rally was "about white genocide, it's about the replacement of our people." In that same vein, the Facebook post on Identity Evropa's page announces its support with the tagline of "You will Not Replace Us," an anti-immigration message used recently in Miami. This message is echoed by the Traditionalist Worker Party and others planning to attend. While the Lee statute may (or may not) be related to this message, it is not so intertwined with the ultimate message that a change in location would render the demonstration meaningless. As pointed out above, The City's requirement that the demonstration be moved to McIntire Park still leaves Plaintiff and his supporters free to express the entirety of their message, is content-neutral, and "otherwise left the demonstration intact… [Plaintiff does] not suggest that there was, or is, any barrier to delivering to the media, or to the public by other means, the intended message…" *Clark,* at 296.

8

6. <u>The Requirement to Move the Demonstration to McIntire Park Does Not Constitute a Heckler's Veto</u>.

There is an enormous difference between the City taking into account the number of expected attendees when determining a permissible location and an otherwise impermissible "heckler's veto." The City is not requiring Plaintiff to pay for the cost of security (prohibited by *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992)), and has not otherwise placed any burdens on Plaintiff's demonstration other than moving the permitted location less than 1 linear mile. Nor does the City's action affect the content of Plaintiff's speech, or in any way enable the Plaintiff's opponents to cut off or limit the content of that speech or to whom it may be directed. See, *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997), in which the Supreme Court found the Communications Decency Act of 1996 unconstitutional for banning transmission of indecent material to persons under 18 in that it "would confer broad powers of censorship, in the form of a "heckler's veto," upon any opponent of indecent speech."

## CONCLUSION

The merchants, residents and businesses of the downtown area of Charlottesville have no interest in stifling anyone's right to exercise free speech; however, they are highly concerned for their safety, their property and the safety of their customers, clients, neighbors and visitors if this very volatile event occurs in this location. The action of the City of Charlottesville in requiring that the planned demonstration take place in McIntire Park rather than Freedom Park in the heart of the City has no bearing on the content of anyone's speech, regardless of their position on the issues on which the event is focused. The action focuses on legitimate governmental concerns: the protection of the rights of its residents to the safety of themselves and their property; and

maintaining open and passable City streets. Moreover, the action provides an ample alternative channel for the exercise of the first amendment rights of the persons attending the event.

                                                           Respectfully submitted,
                                                           JOHN KLUGE
                                                           ALIGHT FUND LLC
                                                           DAVID POSNER
                                                           HUNTER SMITH
                                                           By Counsel

      /s/ Edward B. Lowry
Edward B. Lowry, Esq. (VSB No. 12199)
David W. Thomas, Esq. (VSB No. 73700)
MICHIEHAMLETT PLLC
500 Court Square, Suite 300
Charlottesville, VA 22902
Phone: (434) 951-7200
Fax: (434) 951-7254
elowry@michiehamlett.com
dthomas@michiehamlett.com

## CERTIFICATE OF SERVICE

      I hereby certify that on August 11, 2017, I filed the foregoing via CM/ECF, which caused a notification of electronic filing (NEF) to be sent to the following counsel of record:

      Hope Amezquita, Esq. (VSB No. 74629)
      Leslie Mehta, Esq. (VSB No. 90437)
      American Civil Liberties Foundation of Virginia, Inc.
      701 Franklin Street
      Suite 1412
      Richmond, VA 23219
      Phone: 804-644-8080
      Fax: 804-649-2733
      lmehta@acluva.org
      hamezquita@acluva.org

      Victor M. Glasberg, Esq. (VSB No. 16184)
      Maxwell C. Sokol, Esq. (VSB No. 89589)
      Victor M. Glasberg & Associates

10

Case 3:17-cv-00056-GEC   Document 11-1   Filed 08/11/17   Page 10 of 11   Pageid#: 148

121 S. Columbus Street
Alexandria, VA 22314
Phone: 703-684-1100
Fax: 703-684-1104
vmg@robinhoodesq.com
msokol@robinhoodesq.com

John Whitehead, Esq. (VSB No. 20361)
Douglas R. McKusick (VSB No. 72201)
The Rutherford Institute
923 Gardens Boulevard
P.O. Box 7482
Charlottesville, VA 22906
Phone: 434-978-3888
Fax: 434-978-1789
johnw@rutherford.org
douglasm@rutherford.org

*Counsel for Jason Kessler*


S. Craig Brown, Esq. (VSB # 19286)
City Attorney
P.O. Box 911
605 East Main Street
Charlottesville, VA 22902
Phone: 434-970-3131
Fax: 434-970-3022
brownc@charlottesville.org

*Counsel for Defendants*


                          ___/s/ Edward B. Lowry_____