Civil Action No.: 3:17-cv-00056

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

———

**JASON KESSLER,**
Plaintiff,
v.

**CITY OF CHARLOTTESVILLE, et al.,**
Defendants.

———

**MOTION OF THE DOWNTOWN BUSINESS ASSOCIATION OF
CHARLOTTESVILLE  FOR LEAVE
TO APPEAR AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS'
DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

———

The Downtown Business Association of Charlottesville ("DBAC") seeks leave of this Court to appear as amicus curiae in support of Defendants and file the attached Brief of Amicus Curiae and present oral argument in the Hearing on Plaintiff's Motion August 11, 2017.  This Motion is made on the following grounds:

1. The Downtown Business Association of Charlottesville ("DBAC") is a 501(c)6 organization established in 1999. The association is managed and funded by a group of downtown merchants, restaurants, and other interested businesses for the purpose of supporting and promoting commerce in downtown Charlottesville. The DBAC's primary goal is to market and support the Downtown Mall by promoting the interests of members and non-members alike through a cohesive network highlighting

the variety of services available on and around the Mall. The DBAC has previously worked directly with and through the City of Charlottesville to advocate for a variety of safety-related initiatives on the Downtown Mall including better policing, installation of security cameras, and improved lighting. Given this history and the DBAC's vested interest in the area in and around the Downtown Mall, it believes its perspective would be of use to this Court in deciding the matters now before it.

CONCLUSION

The DBAC therefore respectfully requests this Court to grant this Motion seeking leave to appear as amicus curiae by filing the attached brief and participating in oral argument in the hearing before this Court.

Dated:___08/11/2016_____    Respectfully submitted

/s/ John Joshua Wheeler

J. Joshua Wheeler
VA State Bar No. 36934
400 Worrell Drive
Charlottesville, VA 22911
Telephone: 434-760-2997
Email: jjoshua1959@gmail.com
Attorneys for the *Amicus Curiae*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

_____

**JASON KESSLER,**
Plaintiff,
v.

**CITY OF CHARLOTTESVILLE, et al.,**
Defendants.

_____

ORDER GRANTING THE DOWNTOWN BUSINESS ASSOCIATION OF
CHARLOTTESVILLE'S MOTION FOR LEAVE
TO APPEAR AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS

_____

The Motion submitted by the Downtown Business Association of Charlottesville, seeking leave of this Court to appear as amicus curiae in support of Defendants and to participate in oral arguments is hereby granted.

_____       Date: _____

Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

_____

**JASON KESSLER,**
Plaintiff,
v.

**CITY OF CHARLOTTESVILLE, et al.,**
Defendants.

_____

**MEMORANDUM OF AMICUS CURIAE THE DOWNTOWN BUSINESS
ASSOCIATION OF CHARLOTTESVILLE IN
SUPPORT OF DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

_____

Pursuant to Rule 29 of the Federal Rules of Civil Procedure, subject to obtaining leave of Court, the Downtown Business Association of Charlottesville, by counsel, hereby submit their *amicus curiae* brief in the above styled matter in support of the position of the City of Charlottesville, as follows:

The party filing this brief is the Downtown Business Association of Charlottesville. The *amicus curiae* do business in the City of Charlottesville, Virginia. The *amicus curiae* are paying counsel for the preparation and submission of this brief. No other person or entity contributed money that was intended to fund the preparation or submission of this brief. This brief was prepared entirely by counsel for the *amicus curiae*.

**PRELIMINARY STATEMENT**

This brief is written in response to the Petition for Injunction filed by the Plaintiff against the City of Charlottesville (the "City"), seeking to enjoin the City from requiring the Plaintiff to move his planned demonstration from Emancipation Park (formerly Lee Park) to McIntire Park, both locations being in the city.

## STATEMENT OF FACTS

The *amicus curiae* hereby adopt the statement of facts contained in the brief submitted herein by the City.

## ARGUMENT

## INTRODUCTION

Contrary to the allegations of Plaintiff, this case does not involve government censorship or a "heckler's veto" of unpopular or controversial speech. Plaintiff and any other speakers at the "Unite the Right" rally (Rally) can deliver, word for word, exactly the same speeches they planned to give prior to the City's decision on the permit application. In other words, the City has done nothing to harm Mr. Kessler's First Amendment right to determine for himself the content of his expression on August 12.

Under the First Amendment, however, even content-neutral regulations on speech are subject to constitutional scrutiny if they restrict the time, the place, or the manner in which the speech is to be conveyed. *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). But such scrutiny marks the beginning, not the end of the analysis. Plaintiff effectively skips to the end of the process by portraying First Amendment principles intended to serve as guidelines to courts in assessing the constitutionality of government restrictions on speech as per se conclusions of law. For example, Plaintiff states "the First Amendment prohibits the government from blocking a protest because of its content or

viewpoint." Complaint § 8. While this may be a correct statement of the law as far as it goes, it is of little relevance here for the obvious reason that denying a permit seeker's first choice of location is not the same as a "blocking" of a protest. The only difference between what Mr. Kessler requested and what the City approved is the location for the rally. A speaker's desired location to convey his or her message has never been considered an absolute right under the First Amendment. *Black Tea Society, et al v. City of Boston,* 378 F.3d 8 (1st Cir.2004). If it were, someone seeking a permit for a "free speech rally to limit grid lock" could demand the right to hold the protest on a major thoroughfare at rush hour because the permit seeker believes that place at that time would more effectively convey the message of the rally. Such potential for chaos explains why the U.S. Supreme Court has determined that there are circumstances when government can make distinctions between different groups of protesters.

This is not to say that all picketing must always be allowed. We have continually recognized that reasonable 'time, *place* and manner' regulations of picketing may be necessary to further significant governmental interests. Similarly, under an equal protection analysis, there may be sufficient regulatory interests justifying selective exclusions or distinctions among pickets. Conflicting demands on the same place may compel the State to make choices among potential users and uses. And the State may have a legitimate interest in prohibiting some picketing to protect public order. *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 98 (1972).

The question before this Court is not whether Mr. Kessler has the right to insist upon a specific location for his rally but whether the City gave his preference of location the appropriate degree of consideration in its deliberations of his permit application.

Reviewing the information that was available to the City both at the time of its permit deliberations and today not only completely supports the decision to relocate the rally but also reveals great effort on the City's part to ensure the protection of Mr. Kessler's First Amendment rights.

The City's permit decision was made pursuant to a local "time, place, or manner" regulation. For nearly decades, a significant amount of First Amendment jurisprudence has been devoted to assessing the constitutionality of such regulations on speech. *See Cox v. New Hampshire,* 312 U. S. 569, 312 U. S. 575-576 (1941); *Poulos v. New Hampshire,* 345 U. S. 395, 345 U. S. 398 (1953)*; Cox v. Louisiana,* 379 U. S. 559 (1965)*; Adderley v. Florida,* 385 U. S. 39, 385 U. S. 46-48 (1966)*.* Under a "time, place, or manner" analysis, a court determines if the regulations "are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication." *United States v. Marcavage*, 609 F.3d 264, (3d Cir. 2010).

Plaintiff concedes that permit requirements for protests are constitutional if they consist of content-neutral, narrowly drawn restrictions on speech. Complaint § 8. A review of the City's Standard Operating Procedures for Demonstrations and Special Events (SOP) reveals particular solicitude for the speech rights of all permit seekers regardless of the views they wish to express. The fact that Plaintiff does not allege otherwise supports this conclusion. Plaintiff's argument therefore essentially boils down to either that the City *applied* SOP in an unconstitutional manner or failed to follow its procedures. Thus, Plaintiff's challenge to the City's relocation of Unite the Right IS one of a question of fact. Review of the factual evidence demonstrates that Plaintiff's challenge is unfounded.

In the letter informing Mr. Kessler of the inadequacy of Emancipation Park as a location for his rally, there is nothing that indicates the relocation was based only on concerns raised by purely objective factors, namely the size of the crowd expected to attend. See Complaint, Exhibit B, Letter of City Manager Maurice Jones. Further, the letter makes clear that it came to the conclusion that Emancipation Park was inadequate for Unite the Right based on the conclusions of City personnel whose professional responsibilities include making such assessments. *See* Defendant Response Affidavits. In such situations, the U.S. Supreme Court has made it clear that it is not the job of the judiciary to substitute its own judgment as to the best solutions to address the content-neutral concerns for those of the professionals responsible for such matters on a regular basis. Here, it was the opinion of both fire department and law enforcement officials that the best solution to address the problem that Emancipation Park could not the accommodate the number of people expected to attend was not to cancel the event, but simply move it to a different location.

**I. The City's Move Does Not Violate the Plaintiff's Speech Rights**

There are essentially two questions that are really questions of fact not law. Does the City's decision to move the Rally actually diminish the Plaintiff's speech? And was the decision to move the Rally pretext for viewpoint discrimination? Both are easily answered in the negative.

**A. The Value of a "Place" to Free Speech is Very Low in this Case**

The Plaintiff's claim that moving his Rally away from the ostensible subject[1] of his Rally robs him of the value of his speech is just wrong. The value of the chosen place to the speaker's Free Speech rights varies widely depending largely on whether his audience is willing or unwilling. Often the value of the speaker's speech depends on reaching an unwilling audience. *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014). As long as the speaker has a willing and self-selected audience the venue matters very little. In this case the Plaintiff has a willing audience and will gain not one unwilling listener if he has his choice of venue.

To illustrate the value of place to gain access to an unwilling or unsuspecting audience consider: a protestor of Company X has an interest in demonstrating in front of Company X's headquarters to remind passersby of the company's role in doing harm Y and to confront company executives. If he is moved three blocks away he speech is diminished. However, if he is demonstrating in the woods and is moved to another grove of trees his speech value is the same. In contrast, if a singer in the local coffee shop is given worldwide television coverage at Madison Square Garden, she may miss her usual haunt, but her speech rights (equally protected as those of the protestor on artistic grounds) are enhanced rather than diminished. If the listeners are willing, on the other hand, speech is only diminished by a smaller venue or one where the willing listener cannot attend.

Virtually every case that vested a right to the place of the demonstrator's choosing contains this essential element of an unwilling audience. *Int'l Soc'y for Krishna*

---

[1] The Rally was applied for as a "Free Speech and support of the Lee monument" event which has come to be known as the "Unite the Right" Rally. Even the official Facebook page for the event had only a passing reference to another rally at the site. (The page has since seemingly been taken down)

*Consciousness of California, Inc. v. City of Los Angeles*, 227 P.3d 395 (2010) (Proselytizers in an airport speaking to unreceptive passengers); *Best Friends Animal Soc'y v. Macerich Westside Pavilion Prop. LLC*, 193 Cal. App. 4th 168, (2011). (animal rights activists approaching people shopping for pets); *Ward v. Rock Against Racism*, 491 U.S. 781, (1989) (rock bands annoying the neighbors); *Prigmore v. City of Redding*, 211 Cal. App. 4th 1322, (2012) (political organizations leafleting at the library); *Hill v. Colorado*, 530 U.S. 703, (2000) ("abortion counselors" approaching patients at family-planning clinics).

Only if the Plaintiff were able to reach unwilling listeners, would his First Amendment speech right be affected in more than a *de minimis* way. Here, the Rally's attendees will travel the mile to the other park, as will the Plaintiff's detractors. The Rally speakers can say exactly the same things they would have in Emancipation Park. There will be just as much press and the attendees my still livestream the event. The only deprivation here is a desired backdrop for the speech. In this case the lack of pictures from the Rally with the statue in the background are *de minimus*. The City is not depriving the Plaintiff of highly valued speech – they are depriving him of a prop. And at the same time, they are offering him a larger and safer audience in a more convenient location. This is also a temporary deprivation when the speech is not a matter of timeliness. The Plaintiff's issue will remain an issue and the statue will remain in the park – for at least some period of time. The Plaintiff may speak there on Friday or Sunday and every day thereafter. In the event that he does, he may be able to reach unwilling listeners and in that case the value of his location will again become highly valuable.

### B. A Heckler's Veto is not Effectuated by the Move

The Plaintiff argues that the relocation of Unite the Right constitutes an impermissible "heckler's veto." The First Amendment certainly forbids the City from putting the heckler's veto into effect, "[i]f the speaker's message does not fall into one of the recognized categories of unprotected speech, the message does not lose its protection under the First Amendment due to the lawless reaction of those who hear it. Simply stated, the First Amendment does not permit a heckler's veto." *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 252 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 2013. While Plaintiff's statement is an accurate articulation of a fundamental First Amendment doctrine it fails here because there is neither a veto nor a heckler. As discussed previously, the decision to move the rally does not constitute a veto because Plaintiff can convey the exact same message in McIntire Park as he could in Emancipation Park. There is no heckler because the relocation was not based on opposition to Plaintiff's message but because of the inadequacy of Emancipation Park to accommodate a crowd the size of those expected to attend.

### C. The Accusation of Censorship is Belied by the Speech Enhancing Decision of Relocating the Rally.

While it is absolutely the case that the choice of venue of the speaker deserves proper deference, it is deference to ability of the speaker to enhance or perfect his message through the site of the demonstration. Holding this Rally in front of the Lee statute would indeed punctuate Plaintiff's message and provide for good visuals.

However, holding the exact same Rally a mile away in a park named after the statue's donor, which people can more easily access, where more people can comfortably gather, where the authorities can better ensure the safety of demonstrators and protestors alike, and allowing the downtown to function normally, this venue change simply does not, on-balance, diminish the Plaintiff's speech.

By moving the Rally the City has drawn a great deal more attention to it. There will likely be more press coverage and attendees than could have crowded into Emancipation Park. The speakers will have to change not one word of what they wished to say, the ability to livestream the event will not be diminished, and now the world is watching. If the City meant to deprive the speakers of a platform by denying them the use of the Lee statue as a prop, they must be sorely disappointed.

**II. The City's Move of the Rally is not Pretext for Viewpoint Discrimination**

**A. The Evidence Shows that the City's Actions are not a Matter of "Opposition"**

The Plaintiff claims that the City's motive in relocating the Rally was based the City's opposition to the Plaintiff's message. Plaintiff's Complaint Para. 61. The City has multiple competing interests to consider when planning for and regulating public events including public safety, the protection of property, convenience of public movement, as well as the defense of demonstrators' and protestors' speech rights. None of these require the City to endorse or condone the speech of demonstrators. Obviously the City and Plaintiff do not agree on the propriety of the decision to move the Lee statue—a decision

Plaintiff repeatedly claims is one of the primary motivating factors for the Rally. Associated Press, "Charlottesville City Council Votes to Move Lee Statute" Feb 7, 2017. www.apnews.com/d7b85b452295420c8130583419080cbe. This may be cause for suspicion, but it is not evidence. In fact, ample publicly-available information supports the notion that the City's decision was content neutral and not a viewpoint based aversion to the Rally's message.

### B. The City's Application of the Permit Regulations Shows no Viewpoint Discrimination

The City has adequately preserved the Plaintiffs First Amendment Rights. The Sponsor of this event applied in May for this demonstration permit and has faced no viewpoint or content-based barriers in the consideration of his application. Evidence of the evenhanded application of the regulations can be gleaned, to some degree, from all the ways in which the City has not taken advantage of opportunities to deny or otherwise interfere with this event.

The City could have denied the permit application for any number of reasons at any point in the process. The original application was first submitted for just 400 persons to last for five hours. There were no provisions for shade, water, bathroom facilities, security, or medical assistance. A five-hour event of that size in the heat of August in Virginia certainly presented health and safety concerns that could have resulted in denial or modification under the SOP. SOP 3.4.5(b). The City did not object and apparently the

permit was "deemed granted" under the SOP since the City did not object. SOP 3.4.6(b). Later the Sponsor apparently indicated the desire for sound amplification as required under the SOP. SOP 3.5.7(a). The Sponsor also reportedly added portable bathroom facilities to the permit request. Each of these events started the ten-day window for the City to object over again, but they did not do so. Further, reports of much larger crowds possibly attending appeared and the City still did not require modification or exercise its prerogative to revoke the permit under SOP 3.4.7 and 3.4.5(b-d). Rather, the City appears to have allowed the planning of this event to go forward without interference until it became very clear that it had become unstainable.

What the City did do is follow the content neutral SOP and did so in the manner most favorable to the Plaintiff's speech. By the terms of the SOP, even if the sponsor does not request street closures, once it is determined "that a street closing is necessary" it may require insurance from the sponsor[2] which would have effectively denied the permit. SPO 3.5.2(3)(c). Instead the City chose to offer an alternate location per the same regulation that gave the Rally a bigger safe safer venue. If the City were interested in suppressing the speech of the Sponsor it had every opportunity to do so and declined.

The response that the City has now put in place to move the event is not arbitrary or capricious and, in fact, is in response to ample evidence of the unsuitability of the event's prior location.

---

[2] The Plaintiff in this case reportedly had insurance but had lost it. http://www.c-ville.com/coverage-denied-insurance-rally-cancelled/

**Conclusion**

The Plaintiff has suffered no more than *di minimis* harm to his speech rights and therefore not entitled to relief.

/s/ John Joshua Wheeler

J. Joshua Wheeler
VA State Bar No. 36934
400 Worrell Drive
Charlottesville, VA 22911
Telephone: 434-760-2997
Email: jjoshua1959@gmail.com
Attorneys for the *Amicus Curiae*